Michael ALLEY, et al., Appellants,

v.

RESOLUTION TRUST CORPORATION,
as Receiver for the Federal Asset
Disposition Association.

Margaret Elizabeth ARISTEGUIETA,
et al., Appellants,

v.

RESOLUTION TRUST CORPORATION,
as Receiver for the Federal Asset
Disposition Association.

Nos. 92–7081, 92–7082.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 14, 1992.

Decided Jan. 26, 1993.

As Amended on Rehearing March 4, 1993.

Robert J. Bruce and Eugene A. Over, Jr., Englewood, CO, were on the brief for appellants in No. 92–7081.

F. Carter Tate, Atlanta, GA, with whom Christopher B. Little, Englewood, CO, was on the brief, for appellants in No. 92–7082.

Paul E. Ridley, with whom Peter F. Lovato, III, Dallas, TX, was on the brief, for appellee.

Before: EDWARDS, RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Two groups of former employees of the now-defunct Federal Asset Disposition Association (FADA) sued FADA's receiver, the Resolution Trust Corporation (RTC), in federal district court. Relying on state law, plaintiffs alleged that they had been denied payments due them under FADA's employee benefit policies. The district court held that plaintiffs' state-law claims were preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 *et seq. See Alley v. Resolution Trust Corp.; Aristeguieta v. Resolution Trust Corp.*, 790 F.Supp. 1 (D.D.C. 1992).[1] Because plaintiffs never asserted claims under any specific ERISA provision, the court entered final judgment against them, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

We agree that ERISA preempted plaintiffs' state-law claims, but hold that the district court should have granted plaintiffs leave to amend their complaints to seek relief under ERISA. Accordingly, we affirm in principal part, reverse in part, and remand the cases to afford plaintiffs an opportunity to amend their complaints to assert any ERISA claims they may have.

## I. BACKGROUND

In 1985, the Federal Home Loan Bank Board (FHLBB), acting as head of the Federal Savings and Loan Insurance Corporation (FSLIC), established FADA as a federally chartered savings and loan association.[2] FADA's purpose, as stated in its charter, was to assist in the "acquisition or acceptance and orderly liquidation and disposition of assets acquired by [FSLIC]." Charter of Federal Asset Disposition Association § 4 (issued November 5, 1985), *reprinted in* Appendix to Brief of Appellee at 7. FSLIC owned all of FADA's stock, selected FADA's board of directors, and sent a representative to all FADA board meetings. FSLIC supplied FADA with $25 million in start-up capital and thereafter guaranteed a $50 million line of credit for FADA.

Although FADA thus operated under federal agency (FSLIC) auspices, its *raison d'être* was to bring private-sector efficiency to FSLIC's efforts to dispose of the assets of failed savings and loan institutions. As described by the General Accounting Office, FADA was designed

---

**1.** The district court disposed of both cases in a single Memorandum and Opinion.

**2.** The FHLBB relied on section 406(a) of the National Housing Act, 12 U.S.C. § 1729(a) (1988), as statutory authority for creating FADA. That provision authorized FSLIC, "[i]n order to facilitate the liquidation of insured institutions, ... (2) to provide for the organization of a new Federal savings and loan association for such purpose subject to the approval of the Federal Home Loan Bank Board." *Id.* This provision was repealed by § 407 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 363.

to assist in strengthening the financial health of the FSLIC by using private sector management and marketing techniques to manage assets in the FSLIC system at the lowest cost consistent with sound operations and to sell these assets as fast as is consistent with obtaining the best possible return for the FSLIC and its receiverships.

General Accounting Office, Analysis of the Legal Status of Certain Federal Home Loan Bank System Entities (submitted September 6, 1988), *reprinted in* 134 Cong. Rec. E3353, E3354 (daily ed. October 7, 1988). Consistent with this private-sector orientation, the voting members of FADA's board of directors were private individuals rather than government officials or employees. FADA's employees were not subject to the federal civil service regime [3] and were paid salaries competitive with those paid by private financial institutions. FADA's income, on which it paid federal and state taxes, derived from fees charged clients (primarily FSLIC) for FADA's asset management and consulting services. By 1988, FADA had more than 250 employees and was managing over four billion dollars in assets.

In May 1988, FADA's board of directors adopted a severance pay plan, Policy No. 820, titled Reduction in Force and Separation Pay. *See* Federal Asset Disposition Association, Personnel Policy Manual: Policy No. 820 (dated May 3, 1988), *reprinted in Alley* Stipulated Appendix at 200. Later that year, FADA's board amended Policy No. 820 to provide for a "supplemental severance" or "retention" benefit, including a lump sum payment equal to four months' salary. *See* Federal Asset Disposition Association, Personnel Policy Manual: Policy No. 820 (Addendum), Employee Retention Plan (dated Sept. 29, 1988), *reprinted in Alley* Stipulated Appendix at 202. Circumstances unfolding in 1988 indicated that FADA might soon be abolished by act of Congress; the "retention benefit" was geared to those FADA employees who, in the event of FADA's closure by statute, would nevertheless remain on board until FADA's actual "date of termination." [4] In 1989, Policy No. 820 was again amended to provide that the retention benefit would not be available to FADA employees who received a "comparable offer of employment" from FADA's "successor." [5]

As part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Congress ordered that FADA be liquidated. *See* FIRREA § 501(f), Pub.L. No. 101–73, 103 Stat. 383 (providing that, within 180 days of FIRREA's enactment, the RTC "shall liquidate the Federal Asset Disposition Association"); FIRREA § 501(b)(3)(B), Pub.L. No. 101–73, 103 Stat. 369 (duties of RTC to include managing FADA pending its liquidation). FADA's offices closed in late 1989 and early 1990; on February 5, 1990, FADA was placed in receivership and its assets were transferred to the RTC as receiver. In December 1989, about 175

---

**3.** Both sides share this view. We take no position on the legality of placing FADA employees outside the laws governing federal employment. *But cf.* General Accounting Office, Analysis of the Legal Status of Certain Federal Home Loan Bank system Entities (submitted Sept. 6, 1988), *reprinted in* 134 Cong.Rec. E3353, E3354–55 (daily ed. Oct. 7, 1988) (concluding that the creation of FADA exceeded FHLBB's authority under section 406(a) of the National Housing Act because FADA did not perform the functions of a federal savings and loan association, and opining that FADA employees "should be regarded as federal employees for purposes of title 5 of the United States Code").

**4.** As explained in the Personnel Policy Manual, the "employee retention plan" was designed "to ensure that FADA will retain the services of its employee base and not lose personnel through attrition because of justifiable concerns about the dissolution of FADA." Federal Asset Disposition Association, Personnel Policy Manual: Policy No. 820 (Addendum), Employee Retention Plan § 1 (Sept. 29, 1988), *reprinted in Alley* Stipulated Appendix at 202.

**5.** *See* Federal Asset Disposition Association, Personnel Policy Manual: Policy No. 820 (Addendum), Employee Retention Plan § II(a) (dated May 2, 1989), *reprinted in Alley* Stipulated Appendix at 206. The parties dispute the effect of certain differences in wording between the addenda to the Personnel Policy Manual and related resolutions passed by FADA's board of directors; these disputes are not material for purposes of this appeal and we express no opinion on them.

FADA employees, including all plaintiffs in these two actions, received offers of positions at Federal Deposit Insurance Corporation or RTC offices.[6] A majority of FADA employees (including most of the plaintiffs) accepted these offers and began working at their new posts immediately after their final day of work for FADA.

Plaintiffs in these actions complain that RTC has wrongfully refused to pay them the severance and retention benefits to which they are entitled under Policy No. 820, as amended.[7] They assert reliance on FADA's representation that employees who stayed with FADA through its final days would receive the retention benefits. Plaintiffs sought recovery under various state law theories: breach of contract; breach of fiduciary duty; promissory estoppel; and violation of state statutes. RTC asserted ERISA preemption in its answer, a defense RTC emphasized throughout the litigation. Plaintiffs, nevertheless, insisted on their alleged rights to recover under state law and did not amend their complaints to plead ERISA as an alternate basis for relief.

After discovery, RTC moved for summary judgment. RTC maintained, *inter alia*, that ERISA preempted all of the state-law claims alleged by plaintiffs. The *Alley* plaintiffs, in reply, asked that, if the court ruled for RTC on preemption of the state-law claims, "[p]laintiffs ... be granted leave to amend their Complaint and assert a claim under ERISA." Plaintiffs' Brief in Response to Defendant's Motion for Summary Judgment at 7 n. 1 (citing FED.R.CIV.P. 15). Similarly, at oral argument in the district court on February 28, 1992, counsel for plaintiffs requested leave to amend to include an ERISA claim should the court hold their state claims preempted.

On March 23, 1992, the district court granted RTC's motion and dismissed plain-

tiffs' complaints. The court first ruled that the FADA employee benefit provisions counted as an "employee welfare benefit plan" within the compass of ERISA. *See* 29 U.S.C. § 1002(1)(A). Noting the parties' acknowledgment that "FADA's quasi-governmental status present[ed] an apparently unique question in this regard," 790 F.Supp. at 5, the district court concluded that the FADA policies did not fall within ERISA's exemption for "governmental plans." *See* 29 U.S.C. § 1003(b)(1). The court considered it a "pivotal factor" that "FADA's employees were never subject to government civil service classification or restrictions on salaries, benefits or personnel rules." Mem.Op. 790 F.Supp. at 11. Having determined that the FADA benefits were governed by ERISA, the district court held ERISA's governance preemptive of the state-law claims plaintiffs had endeavored to state. *See* 29 U.S.C. § 1144(a) (ERISA "supercede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan").[8] Because plaintiffs had failed to plead for relief under ERISA, either originally or by specific amendment to their complaints, the court entered final judgment in RTC's favor. 790 F.Supp. at 6 & n. 5.

The parties divide sharply over the proper interpretation and application of FADA Policy No. 820, as amended. For disposition of this appeal, however, we need answer only two questions: (i) whether the state-law claims plaintiffs alleged are preempted by ERISA; and if so, (ii) whether the district court properly entered final judgment for RTC without affording plaintiffs an opportunity to amend their pleadings to allege claims under ERISA.

## II. ERISA PREEMPTION

■ Plaintiffs initially argue that the FADA benefit policy provisions in question

---

6. Seventy-six FADA employees—those who did not receive offers of continuing employment when FADA was dissolved—were paid severance benefits under FADA's plan; these employees are not parties to this litigation.

7. The district court had subject-matter jurisdiction pursuant to a FIRREA provision requiring

that claims against depository institutions for which RTC is receiver be brought in federal district court. *See* 12 U.S.C. § 1821(d)(6)(A).

8. Plaintiffs do not dispute that the various rules of state law upon which they based their suits "relate to" employee benefit plans.

do not qualify as an "employee welfare benefit plan" subject to ERISA. They maintain, particularly, that the retention benefits were a reward for staying, not a relief measure for the loss of employment. We are unpersuaded. "Employee welfare benefit plans," as defined by ERISA, provide benefits "in the event of sickness, accident, disability, death *or unemployment* [.]" 29 U.S.C. § 1002(1)(A) (emphasis added). FADA's retention benefits were payable only upon termination of an employee's position due to a congressional direction for the closure of FADA. Plans that pay benefits upon job termination cushion employees against the impact of unemployment,[9] even if also intended to reward past service. *See Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1145 (4th Cir.1985), *aff'd mem. sub nom. Brooks v. Burlington Industries, Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 324-25 (2d Cir.1985), *aff'd mem.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986).

■ We similarly reject as untenable the *Aristeguieta* plaintiffs' argument that ERISA "cannot, as a matter of law, preempt state law claims filed pursuant to a federal law such as FIRREA." Brief of Appellants at 32. FIRREA's grant of federal *jurisdiction* over state law-based claims against RTC-controlled institutions surely does not render inapplicable substantive federal statutes that may trump the state law upon which a plaintiff seeks to rely.[10]

■ Plaintiffs urge most strenuously, in opposition to RTC's ERISA preemption defense, that the FADA benefits constitute an exempt "governmental plan." *See* 29 U.S.C. § 1003(b)(1). A governmental plan is one

> established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or *by any agency or instrumentality* of any of the foregoing.

29 U.S.C. § 1002(32) (emphasis added). For some purposes, FADA might properly be characterized an agency or instrumentality of the federal government. The roles FHLBB and FSLIC played in creating, supervising, and patronizing FADA gave FADA an undeniable public coloration. On the other hand, certain of FADA's features would not be found in a standard Field Guide to Governmental Entities: FADA's payment of federal and state taxes, for example, cuts strongly against public entity categorization.

To resolve this case, we do not engage in all-purpose characterization.[11] As counsel

9. Corroboratively, FADA's Personnel Policy Manual stated that the retention benefits were designed to assure employees "a reasonable period of opportunity, with income, to pursue other gainful employment." Policy No. 820 (Addendum), Employee Retention Plan § I (dated Sept. 29, 1988), *reprinted in Alley* Stipulated Appendix at 202.

10. The case the *Aristeguieta* plaintiffs cite on this issue, *Rosa v. Resolution Trust Corp.,* 938 F.2d 383 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), is inapposite. Under FIRREA, any claim against an institution in RTC receivership is barred if the claimant failed to exhaust administrative remedies, *see* 12 U.S.C. § 1821(d)(13)(D); in *Rosa,* the court simply held that ERISA claims are subject to FIRREA's exhaustion requirement. *See* 938 F.2d at 391-93.

11. Plaintiffs as well as RTC recite the factors listed in *Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 918 (2d Cir.), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988), for

determining whether an entity is a governmental "agency or instrumentality" for purposes of the ERISA governmental plan exemption. This list includes such factors as whether the entity has a governmental purpose, whether it is publicly controlled, whether it was created or operates pursuant to statutory authority, and its degree of financial autonomy and source of operating expenses. *See id.* As the parties illustrate, one could argue long and hard about FADA's score under the *Rose* test. However, we do not find the *Rose* criteria the most helpful guide. We focus our attention instead on what should be the core concern for ERISA purposes—the nature of an entity's relationship to and governance of its employees.

We note also that *Rose* involved an entity (the Long Island Railroad) affiliated with a *state* government. Concern about protecting state authority over relations with state employees was one reason for the governmental plan exemption, *see Rose,* 828 F.2d at 914; a *Rose*-style test focusing broadly on the extent of governmental contacts may be more appropriate

for plaintiffs acknowledged at oral argument, an entity may be governmental for one purpose and nongovernmental for another.[12] We therefore home in on the question whether FADA counts as a government instrumentality for purposes of the ERISA "governmental plan" exemption. As we next elaborate, in its employment relationships—the area most relevant for ERISA purposes—FADA functioned not like a governmental agency, but like a private enterprise. We therefore conclude that FADA is not exempt from ERISA.

Unsurprisingly, ERISA's text and legislative history do not address whether an entity like FADA falls within the governmental plan exemption. The legislative history does suggest, however, Congress' expectation that "governmental plans," though not governed by ERISA, would be controlled by a comprehensive, legislatively-established scheme. In discussing the exemption for governmental plans, for example, the House Report explained:

> The Act does provide for coverage of public employee plans under Title I but excludes them from the other substantive provisions.... There are literally thousands of public employee retirement systems operated by towns, counties, authorities and cities in addition to the state and Federal plans. Eligibility, vesting, and funding provisions are at least as diverse as those in the private sector *with the added uniqueness added* [sic] *by the legislative process.* For this reason the Committee is convinced that additional data and study is necessary before any attempt is made to address the issues of vesting and funding with respect to public plans.

H.R.REP. No. 533, 93d Cong., 1st Sess. 9 (1973). A background assumption underlying the governmental plan exemption, then, was that public employees exempted from ERISA were in fact covered by some distinctively "public" employee benefit scheme.[13] *Cf.* 29 U.S.C. § 1002(32) (plans of *private employers* governed by the Railroad Retirement Act of 1935 or 1937 specifically exempted from ERISA as "governmental plans"). We find no indication that Congress meant the governmental plan exemption to reach an entity that relates to its employees as would a private business—an entity whose employees are not subject to laws governing public employees generally.

Measured by the terms and conditions of their employment, FADA personnel far more closely resembled private sector employees than they did government workers. Like employees of "ordinary" federally chartered S & L's, FADA's employees were outside the civil service system, and were not subject to personnel rules or restrictions on salaries and benefits imposed generally on federal employees. *See* 5 U.S.C. § 2105 (definition of federal "employee" for purposes of title 5); 5 U.S.C. § 5101 (classification of positions for purposes of pay and for use "in all phases of personnel administration"); 5 U.S.C. §§ 8331 *et seq.* (civil service retirement benefits); 5 U.S.C. §§ 8401 *et seq.* (federal employees' retirement system). Indeed, both sides acknowledge that a major reason for FADA's creation was to make possible the engagement of skilled personnel by offering salaries commensurate with those in the private sector. Furthermore, the voting members of FADA's board of directors—the persons responsible for selecting FADA's management and setting its employment policies— were not government officials, but private individuals. The special "retention bene-

---

where state-affiliated entities are concerned. Because FADA was affiliated with the United States Government, such federalism concerns are not implicated in this case.

12. *Cf. Krupp v. Lincoln University,* 663 F.Supp. 289, 292 (E.D.Pa.1987) (holding that university, although declared an "instrumentality of the Commonwealth" by a Pennsylvania statute, was not a state instrumentality for purposes of ERISA's governmental plan exemption).

13. Summarizing ERISA's legislative history, one court has said that the "[d]iscussions in the congressional reports and hearings on the question of the exclusion of governmental plans are replete with such general references as 'public employee plans,' 'public sector plans,' 'State and local public employee funds' and 'plans sponsored by State and local governments.'" *Feinstein v. Lewis,* 477 F.Supp. 1256, 1261 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 573 (2d Cir.1980).

fits" involved in this case were established by that board, and are hardly characteristic of public-sector schemes.

In concluding that FADA's employee benefit plans are not exempt from ERISA, we are mindful that FADA's public affiliations are with the *federal* government.[14] Appellants have identified no entity that escapes ERISA's reach due to its federal character, yet is not governed by federal civil service laws or any other public employment benefits scheme.[15] It would be anomalous, we think, to characterize FADA as an instrumentality of the United States Government and then, on the basis of its *federal* character, expose it to a disparate array of *state*-based common law and statutory claims. *Cf. Gilbert*, 765 F.2d at 327 (noting that "policy of national uniformity" favored ERISA preemption of state common law and statutory claims where "plaintiffs were employed in 16 different states").

In sum, and in full accord with the district court, we hold that ERISA provides the regulatory regime for the benefits at stake and that the federal act preempts the state-law claims plaintiffs set out in their complaints.

### III. COMPLAINT AMENDMENT

Noting that plaintiffs had failed to plead ERISA violations in their complaints, the district court entered final judgment against them, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief could be granted. *See* 790 F.Supp. at 6 & n. 5. We hold that the district court should have granted plaintiffs' request, made at the hearing on the summary judgment motion, for leave to amend their complaints to assert entitlement to relief under ERISA.

Final judgment is appropriately rendered under Rule 12(b)(6) when it is plain that the plaintiff has no claim to state; when a plaintiff has imperfectly stated what may be an arguable claim, however, leave to amend is ordinarily in order. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (reaffirmed in, *e.g., Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976)); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Consistently, sister courts have remanded for further airing cases similar to the two we confront; they have permitted plaintiffs who originally and incorrectly relied on state law as the basis for their employee benefit claims to proceed instead, on essentially the same facts, under ERISA. *See Shannon v. Shannon*, 965 F.2d 542, 552–53 (7th Cir.), *cert. denied sub nom., Shannon v. United Servs. Auto. Ass'n*, — U.S. —, 113 S.Ct. 677, 121 L.Ed.2d 599 (1992); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1077–78 (7th Cir.1992); *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir.1989).

---

**14.** As suggested *supra* at note 11, the governmental plan exemption in part reflects the pronounced federalism concerns implicated by federal regulation of states' relations with their own employees, *see Feinstein*, 477 F.Supp. at 1261 (discussing legislative history); again, such concerns obviously are not present here.

**15.** Our conclusion that FADA's benefit policies were not "governmental plans" for ERISA purposes is fortified by FIRREA provisions relating to the abolition of FSLIC and FHLBB. When Congress abolished FSLIC and FHLBB, it specifically addressed the fate of these agencies' employees: under sections 403 and 404 of FIRREA, these employees were automatically transferred to the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, or the Federal

Housing Finance Board, their positions in the new agencies were "guaranteed" for one year at their prior pay levels and status, and specific provisions were enacted concerning their continued membership in federal employee benefit programs. *See* FIRREA §§ 403–404, Pub.L. No. 101–73, 103 Stat. 360–63. FADA employees, however, were *not* included in this employee transfer scheme. *See* H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 444 (1989) ("It is the intent of the Committee that the employees of FADA be subject to the regular hiring procedures established by the RTC for prospective employees and that no employee of FADA shall automatically become an employee of the RTC when FADA is wound down or sold by the RTC.").

RTC urges that plaintiffs here resisted reliance on ERISA too long, and have passed the point at which justice requires indulgence of pleading amendments. *See* Fed.R.Civ.P. 15(a) ("leave [to amend] shall be freely given when justice so requires"). The argument is not without force. Once confronted with motions for summary judgment, plaintiffs approached the limits of the liberal pleading regime's indulgence by failing promptly to tender any alternate, ERISA-based claim.

The record, however, does not suggest bad-faith withholding on plaintiffs' part. ERISA's governance has been RTC's insistent plea from the start and so comes to defendant-appellee as no surprise. We count it important also that plaintiffs have represented in their briefs on appeal the absence of any need to allege new facts or engage in additional discovery. *Cf. Williamsburg Wax Museum v. Historic Figures, Inc.*, 810 F.2d 243, 247 (D.C.Cir. 1987) (leave to amend properly denied where plaintiff sought to allege new facts requiring extensive discovery several years after complaint was filed); *Doe v. McMillan*, 566 F.2d 713, 720 (D.C.Cir.1977) (affirming denial of leave to amend to allege new theory of case and add defendant 38 months after complaint was filed), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978). The only change plaintiffs will make on remand, they aver, is in the legal theory supporting their request for relief. *See Hanson v. Hoffmann*, 628 F.2d 42, 53 n. 11 (D.C.Cir.1980) ("Unless a defendant is prejudiced on the merits by a change in legal theory, a plaintiff is not bound by the legal theory on which he or she originally relied."); 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219 at 192–94 (1980).

### CONCLUSION

For the reasons stated, we affirm the judgment of the district court in principal part. That court correctly held that FADA was not an agency or instrumentality of the government for purposes of employee relations. We vacate the dismissal of plaintiffs' actions, however, and direct the district court to allow plaintiffs to amend their complaints to allege ERISA as the law under which their claims arise. In so directing, we express no opinion on whether the plaintiffs in fact have viable ERISA claims, nor do we attempt to determine what facts-in-dispute would be relevant to such claims. These are matters properly aired and decided in the first instance in the district court.

*Affirmed in principal part and remanded in part.*

### ORDER

March 4, 1993.

PER CURIAM.

On consideration of the technical corrections requested by appellee Resolution Trust Corporation in its rehearing petition and memorandum in support, filed February 9, 1993, it is hereby

ORDERED that the petition be granted in part and that the court's opinion, released January 26, 1993, be amended as listed below:

[Corrections incorporated for purposes of publication].

These alterations do not modify the substance of the opinion in any significant respect. It is

FURTHER ORDERED that each side shall bear its own costs.