**F I L E D**
United States Court of Appeals
Tenth Circuit

MAR 6 1998

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

LINDA MCGRAW,

     Plaintiff-Appellant,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, a
corporation,

     Defendant-Appellee.

No. 97-6064

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-95-1076-T)

Glen Mullins, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Arlen E. Fielden, Crowe & Dunlevy, Oklahoma City, Oklahoma, for Defendant-Appellee.

Before **PORFILIO**, **ANDERSON,** and **BALDOCK**, Circuit Judges.

**PORFILIO**, Circuit Judge.

Linda McGraw appeals three adverse orders resulting in the denial of her claims for medical insurance benefits for physical therapy and home nursing care prescribed to treat her multiple sclerosis. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

### A. The Disease

Multiple sclerosis (MS) is a demyelinating disease of the central nervous system. That is, it is believed, deficiencies or abnormalities in the immune system trigger immune cells to attack myelin, the insulating sheath surrounding nerve cell processes located in the central nervous system. The damaged myelin cannot transmit electrical impulses along the nerve fiber pathways in the brain and spinal cord causing the individual to lose strength, coordination, and balance; to have problems with balance and bladder control; and to experience numbness, tingling, and blurred or double vision.[1] Most commonly, MS occurs in a relapsing/remitting form in which exacerbations or relapses, periods of symptom flare-ups, are interrupted by remissions, times when no new symptoms occur or symptoms improve. Much less common is a chronic progressive form in which spinal cord and cerebellar dysfunction predominate. Despite these two broad categorizations,

---

[1]Numerous articles found in the Appellant's Appendix, Volume V, provide the basis for this summary. *See, e.g.,* Galen Mitchell, M.D., *Update on Multiple Sclerosis Therapy,* 77 Contemporary Clinical Neurology 231 (January 1993); **Multiple Sclerosis Handbook**, UCSF - Mount Zion Medical Center (1995) [hereinafter **Multiple Sclerosis Handbook**].

the course of MS is unpredictable.[2] Because the cause of MS remains unknown, there is no prevention or cure. Instead, an armamentarium of treatments for MS-related symptoms, drugs that may modify the course of the disease, and rehabilitative and maintenance therapies to promote and improve functionality and independence are accepted approaches in the present symptomatic management of MS.[3]

## B. Plaintiff's Medical History

In 1983, Dr. Sherman Lawton, a board certified neurologist in Oklahoma City, diagnosed Linda McGraw, then age twenty-eight, with MS. By the spring of 1990, Ms. McGraw used a walker to stabilize her gait and relied on a wheelchair for longer distances. In 1991, Dr. John H. Noseworthy, a neurologist at the Mayo Clinic in Rochester, Minnesota, performed a comprehensive evaluation of Ms. McGraw and the progression of her MS and recommended an inpatient evaluation at St. Mary's Hospital of Physical Medicine and Rehabilitation Unit to more comprehensively address her problems with mobility.[4] Physically too weak to travel back to Mayo, Ms. McGraw was

---

[2]Susan B. O'Sullivan, EdD, PT, and Thomas J. Schmitz, PhD, PT, *Physical Rehabilitation: Assessment and Treatment*, Chapter 22, *Multiple Sclerosis* 451 (3d ed. 1994).

[3]*Multiple Sclerosis Handbook*, at 1674.

[4]Dr. Noseworthy later summarized his evaluation in a December 17, 1992 letter, stating,

She has relapsing-progressive multiple sclerosis and is markedly disabled.
At that time, she was unable to walk more than a few steps with assistance

(continued...)

referred to Dr. Donald L. Landstrom, another board certified neurologist in Oklahoma City, who examined her and confirmed Dr. Noseworthy's recommendation for inpatient rehabilitation. Dr. Landstrom then admitted Ms. McGraw to the HealthSouth Rehabilitation Center on January 13, 1992, for twice daily physical and occupational therapy[5] which was completed on February 1, 1992.

On another front, Dr. David R. Rittenhouse, a urologist, was treating Ms. McGraw's recurrent urinary tract infections, another manifestation of the course of MS. Indeed, as immobility increases so do urinary tract infections unless the patient readily transfers to a commode or is catheterized. Although Gary McGraw, Linda's husband, was able to catheterize his wife in the early morning, Dr. Rittenhouse ordered home nursing visits to perform the additional catheterizations, the numbness in Ms. McGraw's hands and her immobility making self-catheterizations daunting. A nurse then would visit daily to monitor her bladder function as well as record vital signs and assist with some physical therapy.[6]

---

[4](...continued)
and required two assistants to climb onto the examining table. She was, in addition, disabled by emotional incontinence, cerebellar dysarthria, rotatory nystagmus, and visual loss .... In addition, she was troubled by sciatica.

[5]The record indicates physical therapy addresses problems with gait and balance in the lower extremities, while occupational therapy targets a patient's dexterity and upper body coordination.

[6]Dr. Rittenhouse wrote, "Her inability to evacuate her bladder, when necessary, by transferring to a commode does put her at a higher risk of further problems with recurrent

(continued...)

Thus, to combat these two fronts, the interrelationship of functionality and the prevention of bladder infection, Dr. Lawton ordered additional outpatient physical therapy through Baptist HomeCare with the goal of improving Ms. McGraw's endurance, strength, and mobility. Explaining this treatment, Dr. Lawton wrote her medical insurer, the Prudential Insurance Company of America,

> Beginning in April of 1992 it was necessary to resume physical therapy for Linda in her home. She is unable to obtain this therapy outside of her home because of marked limitations. For the patient to be seen outside the home it would be necessary for her to be carried to a wheelchair and then be carried into a facility.

The following May 1993, noting Ms. McGraw "had lost much of her ability for selfcare," Dr. Lawton again sought precertification for inpatient care at Baptist Medical Center, explaining, "her case is amenable to intensive physical and occupational therapy, which is clearly indicated in an attempt to improve the quality of this patient's life."

This second in-patient stay was followed by home physical therapy and skilled nursing services provided by Hillcrest Home Health Care and Hillcrest Health Center to help Ms. McGraw maintain functionality and assist in her catheterizations. Dr. Rittenhouse and Dr. Gena Gardiner, a family practitioner, ordered this care.

### C. The Conflict

For each of these episodes of care, HealthSouth Rehabilitation Center, Baptist Care Advantage, Baptist Medical Center, Hillcrest Home Healthcare, and Hillcrest Health

---

[6](...continued)
urinary tract infections or progressive injury to her bladder."

Center, Gary McGraw submitted claims for reimbursement totaling about $47,000 from his medical insurance plan, Prudential Plus, a policy offered by Prudential (the Plan) which his employer, Lifefleet, Inc., purchased.  Prudential denied each claim under the Plan's general exclusion of unnecessary services or supplies for the diagnosis or medical care of a sickness or injury.  Under this provision, to avoid the exclusion and receive payment, the service must be needed or "medically necessary."  The Plan defines this term:

> To be considered "needed", a service or supply must be determined by Prudential to meet all of these tests:
>
> (a) It is ordered by a Doctor.
>
> (b) It is recognized throughout the Doctor's profession as safe and effective, is required for the diagnosis or treatment of the particular Sickness or Injury, and is employed appropriately in a manner and setting consistent with generally accepted United States medical standards.
>
> (c) It is neither Educational nor Experimental or Investigational in nature.

To decide whether to exclude a particular service, a case manager reviews the claim and makes a recommendation to the medical director.  Prudential then relies upon a three-tiered review process.  At the first level, the local medical director decides whether the claim is covered by the policy.  A challenge of that decision then goes to Prudential's regional medical director.  At the third level, an appeals committee comprised of several members who submit individual ballots may confirm or reverse the regional medical director's decision.

In this case, the medical director, Dr. Boyd Shook, board certified in internal medicine, made the initial decision to deny payment of the claim based on his belief "[p]hysical therapy does not affect the course of MS" and was therefore not medically necessary. The regional medical director, Dr. Sharon Lewis, who had previously practiced pediatrics, reviewed the decision and agreed. The appeals committee affirmed these decisions.

### D. The Litigation

Invoking diversity jurisdiction, Ms. McGraw filed this lawsuit claiming Prudential, by failing to pay for medical expenses covered by the Plan, had breached its duty to deal fairly and act in good faith under Oklahoma law. To support the application of state law, Ms. McGraw alleged her husband's health insurance policy qualified as a governmental plan exempt from the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1003(b)(1) (ERISA). Prudential sought summary judgment, contending ERISA preempted the application of state law and barred three of her five claims because Ms. McGraw failed to exhaust her administrative remedies; and Prudential's denial of the two remaining claims was not arbitrary and capricious.

In three separate orders, the district court granted summary judgment for Prudential. First, it rejected Ms. McGraw's effort to characterize her medical insurance policy as a "governmental plan" to extricate it from ERISA's federal statutory web. Having found the Plan governed by ERISA, the court then granted Prudential's second

motion for summary judgment concluding Ms. McGraw failed to exhaust her administrative remedies for the claims submitted for services rendered by HealthSouth Rehabilitation, Hillcrest Home Healthcare, and Hillcrest Health Center. In a final order examining the denial of coverage for the two surviving claims, the district court held Dr. Shook's determination the treatments were not medically necessary, while perhaps made without benefit of a review of Ms. McGraw's medical records, was nevertheless not arbitrary and capricious because subsequent review assured the initial decision was reasonable and made in good faith.

The district court's orders in response to cross-motions for summary judgment merit *de novo* review. **Garratt v. Walker**, 121 F.3d 565, 567 (10th Cir. 1997). We must assure the record demonstrates there is no genuine issue of material fact and, even after construing all inferences in favor of the non-moving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II. GOVERNMENTAL PLAN

Despite ERISA's regulatory and remedial sweep, Congress did not include public or governmental benefit plans within its reach believing, in part, state and local governments' ability to tax, would enable them to operate employee benefit systems that would "avoid the pitfalls of underfunding." **Hightower v. Texas Hosp. Ass'n**, 65 F.3d 443, 449 (5th Cir. 1995); *see also* **Rose v. Long Island R.R. Pension Plan**, 828 F.2d 910, 914 (2d Cir. 1987). Hence, under ERISA,

> [t]he term "governmental plan" means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing....

29 U.S.C. § 1002(32). The plain language of this subsection focuses on the public entity, "the government of any State or political subdivision thereof," that "established or maintained" the plan. ERISA deems these publicly-spawned plans to be exempt.

While conceding her Plan is an employee benefit plan within the meaning of ERISA, 29 U.S.C. § 1003(a), Ms. McGraw persists in arguing it is a "governmental plan" exempt from ERISA. The weight of her position rests on the degree of control the Emergency Medical Services Authority (EMSA), an Oklahoma public trust, exercises over her husband's employment. That is, although her husband's paycheck comes from Lifefleet, Inc., a company owned by Secomerica, Inc., a subsidiary of a Japanese corporation, EMSA, in fact, controls and supervises all of her husband's work, owns all of the equipment connected with the delivery of ambulance services, purchases all supplies under its tax exempt status, and holds the license permitting emergency workers supplied by Lifefleet to operate. Indeed, EMSA, which provided Mr. McGraw's retirement plan, is like a vacuum, she offers, a shell into which Lifefleet employees are drawn to perform the essential functions for which EMSA was statutorily enacted.

Coloring an employee's work with a governmental aura, however, shifts the statutory focus and cannot substitute for addressing the core of the inquiry: Did EMSA, a public trust established in Oklahoma to operate and furnish emergency health services for

- 9 -

the "convenience, welfare, public health and safety" of the inhabitants of Tulsa and Oklahoma City purchase, establish or maintain the Plan? The record clearly reflects it did not. While Ms. McGraw may argue her husband's private employment with Lifefleet, now American Medical Response of Oklahoma, Inc. (AMR), served only as a conduit for his actual employment with EMSA, that characterization ignores the fact EMSA did not establish the Plan or directly employ Mr. McGraw. Instead, Secomerica purchased the Plan for the employees of Lifefleet/AMR; Lifefleet/AMR pays Mr. McGraw's salary; and Lifefleet/AMR contracts with EMSA solely to provide its personnel for EMSA's emergency services.[7]

*Alley v. Resolution Trust Corp.*, 984 F.2d 1201 (D.C. Cir. 1993), parallels this case. There, employees of the then defunct Federal Asset Disposition Association (FADA) sued its receiver, the RTC, for payments due under FADA's employee benefit plans. FADA employees operated under federal agency (FSLIC) auspices; its employees were not subject to federal civil service rules and were paid salaries competitive with those paid by private financial institutions. Though acknowledging FADA's "undeniable public coloration," the D.C. Circuit instead "home[d] in on the question whether FADA

---

[7]Included in the record are two documents governing EMSA's emergency services operations. Each contains a definitions section which in the Oklahoma City Interlocal Cooperation Agreement defines "Operations Contract" to mean "the contract for purchase of ambulance services between EMSA and its then-contracted firm (the 'Operations Contractor') for provision of ambulance services throughout the Regulated Service Area." EMSA paid Lifefleet/AMR based on the number of transports. In contrast, EMSA hires and pays the salary of its medical director who serves at the pleasure of the EMSA board.

- 10 -

counts as a government instrumentality for purposes of the ERISA 'governmental plan' exemption ... [I]n its employment relationships -- the area most relevant for ERISA purposes -- FADA functioned not like a governmental agency, but like a private enterprise." *Id.* at 1205-06. Examining those ***employment relations***, the court concluded Congress did not intend the governmental plan exemption "to reach an entity that relates to its employees as would a private business -- an entity whose employees are not subject to laws governing public employees generally." *Id.* at 1206.

This analysis and rationale encompass the facts presented here. While Mr. McGraw performs those tasks assigned to a public agency under Oklahoma law, the terms and conditions of his employment more closely resemble those of private sector employees. EMSA's setting the professional standards and supervising the delivery of emergency services do not transform its Lifefleet/AMR personnel into governmental workers. Instead, as noted, too many other indicia of private sector employment dominate these facts. *See also **Hightower***, 65 F.3d at 443 (employees of county hospital could not claim ERISA exemption when county hospital was leased to a private foundation which took over its operation as well as the retirement plan); ***NLRB v. Parents & Friends of the Specialized Living Center***, 879 F.2d 1442 (7th Cir. 1989) (employees of not-for-profit Illinois corporation which operated state-built, licenced, and regulated intermediate care facility could not claim exemption for their benefit plan).

Thus, we hold Ms. McGraw's Plan is not a governmental plan. ERISA then preempts the application of state law and provides "a panoply of remedial devices," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)), to assure participants and beneficiaries of benefit plans a "full and fair review" of their claims. 29 U.S.C. § 1133(2).

## II. REVIEW OF DENIAL OF BENEFITS UNDER ERISA

### A. Standard of Review

*Firestone* supplies the standard of judicial review of benefit determinations by fiduciaries or plan administrators. To remain consistent with principles of trust law, the Court held "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115. If, however, the benefit plan gives discretion to an administrator or fiduciary who operates under a conflict of interest, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion,'" the Court qualified. *Id.* (quoting Restatement (Second) of Torts § 187 cmt.d (1959)). Thus, "a conflict of interest triggers a less deferential standard of review." *Chambers v. Family Health Plan Corp. of Okla.*, 100 F.3d 818, 825 (10th Cir. 1996); *Pitman v. Blue Cross & Blue Shield*, 24 F.3d 118, 123 (10th Cir. 1994); *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir.

1996) ("Inasmuch as the law is highly suspect of 'fiduciaries' having a personal interest in the subject of their trust, the 'abuse of discretion' standard is not applied in as deferential a manner to such plans."). We have held the degree of deference to accord such a decision will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible. *Chambers*, 100 F.3d at 826-27; *Pitman*, 24 F.3d at 123.

Nonetheless, the parties clash over what standard of review actually governs the facts of this case, Ms. McGraw urging *de novo* as the more promising route to overturn the benefit determination and Prudential insisting although it was not the Plan administrator but merely performed "claims administrative functions," the Plan gave it discretion to interpret its terms. However, in the event we find the fiduciary has discretion to interpret the Plan, Ms. McGraw asks we heavily weigh Prudential's conflict of interest in denying her benefits.

Here, the Plan expressly gives Prudential discretion to decide what is medically necessary. It states, "To be considered 'needed', a service or supply must be *determined by Prudential* to meet all of these tests...." *Your Prudential Plus Health Plan*, at 31 (emphasis added). Thus, "we review *de novo* the [district court's] application of the arbitrary and capricious standard to [Prudential's] decision denying [Ms. McGraw's] benefits. *Chambers,* 100 F.3d at 827 (quoting *Pitman*, 24 F.3d at 121). However, because every exercise of discretion impacts Prudential financially, filling or depleting its

- 13 -

coffers, we afford its decisions less deference depending on the degree of conflict manifest.

## B.  Arbitrary and Capricious

A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms.  ***Semtner v. Group Health Serv. of Okla.***, 129 F.3d 1390, 1393 (10th Cir. 1997); ***Torix v. Ball Corp.***, 862 F.2d 1428, 1429 (10th Cir. 1988). The district court held Prudential's denial of benefits for physical therapy provided by Baptist HomeCare at the direction of Dr. Lawton from May 28, 1992, through September 1992 was a reasonable interpretation of the Plan.  As noted, Dr. Lawton wrote Prudential that Ms. McGraw's "marked limitations" warranted in-home physical therapy, eliminating the need to carry her chair to and from transportation and to and from the facility.  This judgment, he stated in his deposition, was premised on his view physical therapy is recognized in the treatment of MS to provide essential physical support which improves the individual's strength and endurance as well as her ability to perform the activities of daily living (ADL).[8]

The decision to deny reimbursement for the care, however, was premised on Dr. Shook's *opinion* physical therapy does not affect *the course* of MS.  An internist who had given up his practice by 1989 to become "the medical director of all of the Prudential

---

[8]These ADL refer to basic tasks made daunting by MS; for example, dressing, eating, bathing, and communicating.

- 14 -

*products* in Oklahoma City" (emphasis added), Dr. Shook acknowledged before making the decision, he did not review Ms. McGraw's medical records,[9] did not talk to her neurologist, did not examine Ms. McGraw, and did not read any medical literature "[b]ecause it was such a simple straightforward decision." He stated his decision was based on the *nature* of MS, no doubt referring to its progressive degeneration of the central nervous system.[10] To warrant physical therapy, he explained that Prudential's internal protocols required a showing the condition would improve; and because there was no evidence any intervention would even have anything to do with maintenance, physical therapy, in his opinion, was not medically necessary.

In contrast, Ms. McGraw's treating neurologists testified there is a critical distinction in the delivery of any care between what is *treatable* and what is *curable,* emphasizing that "treatment" in the context of MS at this stage in the understanding of the disease targets its *effects* and concentrates on whatever new symptoms arise. Indeed, not getting worse may amount to "improving." Thus, maintaining functionality -- stretching out the legs to prevent contractures which commonly afflict MS patients,

---

[9]Michele Beasely, Prudential's appeals coordinator, testified Ms. McGraw's medical records were not ordered until January 1995 and were not in the appeal file.

[10]In its brief, Prudential describes MS as a disease with no cure, citing deposition testimony in the record. Prudential writes, "Whether there is any effective treatment is unsettled. However, nothing will stop the progression of the disease and no treatment will *restore* a patient's loss of strength." (italics added). Of course, this characterization would also fit patients suffering from many chronic progressive medical conditions such as rheumatoid arthritis.

coordination exercises, strengthening the upper body -- is addressed in the literature submitted in the Appendix and uncontroverted by Prudential, as essential in the treatment of the effects of MS.[11] Although the district court credited a "difference of opinion that can exist between medical doctors as to whether or not physical therapy is medically necessary to treat multiple sclerosis," the assertion does not quite capture Dr. Landstrom's response. To a question about whether there could be a reasonable good faith disagreement among doctors about the place of physical therapy in the treatment of MS, he answered, "Well, I suppose there could be, doctors can disagree about just about anything, but I think it would be difficult to find a physician who would say that [] physical therapy has no place in the treatment of multiple sclerosis."

In fact, sixteen of Ms. McGraw's approximately forty outpatient visits in the Baptist HomeCare claim were automatically paid, deemed "medically necessary," based on a confidential, internal Group Claim Division Memorandum (GCLM 90-42), which

---

[11]Included in the record is a letter from Dr. Robert Daroff, Professor of Neurology and Chief of Staff at University Hospitals of Cleveland. He wrote, "Physical therapy and/or physiotherapy is 'medically necessary' for the medical care of many patients with multiple sclerosis. To claim otherwise is both ignorant and heartless." Dr. Daroff submitted literature to support the statement. When asked, Dr. Shook said the literature "is mostly written by self-serving people. There's nothing to keep people from serving their own interest, you know, by writing an article. It happens all the time."

Dr. Lewis, the regional medical director, referenced in making her decision.[12]  That

guideline[13]states, in part,

> Physical therapy should be a short-term intensive and goal-oriented
> program ordered for a condition having potential for significant
> improvement.  We consider a "significant improvement" to be a measurable
> and substantial increase in the patient's physical functional abilities
> compared to his/her ability at the time treatment began.

As we read the record, Prudential has modified its definition of "medically

necessary" with the additional requirement the treatment provide *a measurable and*

*substantial increase* in functional ability for "*a condition having potential for significant*

*improvement*."  This guideline is not binding but imposes on the "condition" of MS the

requirement it has a "potential for significant improvement."  However, under the terms

of the Plan, the medical director and subsequent Prudential fiduciaries reviewing the

claim were charged with assuring only that the treatment is ordered by a doctor; is

generally accepted under United States medical standards; and is neither educational,

experimental, or investigational in nature.  Prudential's interpretation of the Plan with this

---

[12]In her affidavit, Dr. Sharon Lewis stated, "use of these guidelines in considering medical necessity is a determination for a Prudential physician."  Because the guideline authorized physical therapy for "short term, intensive and goal oriented treatment of a condition which has the potential for significant improvement, as compared to when the therapy began," and Ms. McGraw's "disease is a chronic progressive disease with relapses and remissions ... only short term physical therapy would be beneficial, if goal oriented."

[13]Prudential representatives testified the guideline was not intended to be binding. For example, Lynne Wheeler, a registered nurse who was a Prudential case management supervisor, stated the GCLMs are guidelines, not rules, so Dr. Shook would have the discretion to go beyond them.

criterion alters its scope and is unreasonable. Moreover, had Prudential's representatives read the hospital notes, medical records, and neurologists' letters, they might have discovered that each treating physician ordered physical therapy to enhance Ms. McGraw's strength, endurance, and motor functions. Ultimately, however, improving Ms. McGraw's functionality would permit her to live more comfortably. And that's the rub. Using GCLM 90-42, Prudential then characterized the means to that end as "medically beneficial" but not "medically necessary" because the treatment in its view would not alter the *course* of the disease.[14]

We apply the same analysis and reasoning to Prudential's handling of Ms. McGraw's claim for inpatient physical therapy at Baptist Medical Center which was denied by Dr. Shook and the denial approved by Dr. Lewis and the appeals committee. Dr. Lewis explained in her affidavit the denial was based in part on the statement in Dr. Lawton's discharge summary "the patient has had a progressive decline over the last three years, which has been particularly acute for the last eight months and the admission was an attempt at intensive therapy, in hope that the patient could regain some degree of ambulation." While Dr. Lewis believed this explanation qualified the treatment as "medically necessary," she stated, "I did not believe inpatient confinement for that therapy was necessary, because I found nothing listed on the admission orders that would

_____

[14]Arguably, were this criterion carried to its logical conclusion, no MS patient could qualify for reimbursement of certain medical services, and the contract of insurance would be illusory.

- 18 -

have required inpatient care.[15]  In addition, nurses' notes ... reflect that Mrs. McGraw left the hospital on a pass, accompanied by her husband, and had a good time.  I believe the medical necessity of inpatient confinement is suspect where a patient is either able or allowed to leave the hospital on a pass."  We find this statement shocking.  There is nothing in the record suggesting proper inpatient physical therapy mandates a twenty-four hour confinement, or that periods away from the hospital when therapy is not being administered are incompatible with proper treatment.  Indeed, one would assume the opportunity for entertainment would be not only therapeutic, but also desirable in treating this illness.

This case is like *Bedrick*, 93 F.3d at 149.  There, a child, Ethan Bedrick, suffered from severe cerebral palsy and spastic quadriplegia, a condition in which motor function is impaired in all four limbs by hypertonia, an abnormal resistance to passive stretching of the muscles.  To counteract these contractures or curling up of the limbs, the muscles must be stretched.  "The diabolical thing about hypertonia is that, unless properly treated, it can get much worse.  Unless each hypertonic muscle is regularly stretched (and its abnormal resistance thereby overcome), the muscle itself changes.  Long, flexible tissue is replaced by shorter, inflexible, fibrotic tissue.  The resulting curled-up appendage is

---

[15]Any review of the medical records for Ms. McGraw's past hospitalization for physical therapy and the home care regime would have documented the treating neurologist's decision to hospitalize at this time, however.

called a contracture."[16] *Id.* at 151. Unless an adult actively exercises the child's limbs,

the infant will curl into the position of least resistance. Ethan's pediatrician recognized

Ethan's "poor prognosis" but ordered physical therapy on the fifty/fifty chance the child

would be able to walk by age five. *Id.* In the face of this medical record, Travelers

limited Ethan's physical and occupational therapy to fifteen sessions per year and denied

claims for prescribed durable medical equipment, a bath chair and an upright stander.

Applying a less deferential review,[17] the Fourth Circuit encountered a similar scenario

where Traveler's definition of medical necessity was supplemented by "a finding that the

specified treatments did not reach a level of potential for significant progress which

would allow the therapies to be provided on a medically necessary basis." *Id.* at 153.

Thus, the Fourth Circuit, first, recognized the "significant progress" requirement was not

part of the plan. Second, it noted,

> such a requirement makes no sense. If as his doctors and therapists believe,
> intensive therapy is necessary to *prevent harm* (e.g. contractures), then it is
> medically necessary "treatment" for his cerebral palsy. ***It is as important
> not to get worse as to get better.*** Third, there is no medical evidence in the
> record from which Travelers could make such a "finding." Both [his
> treating physicians] reported "progress," and [one doctor] did not even call
> [the Travelers' representative]. Fourth, the implication that walking by age
> five would not be "significant progress" for this unfortunate child is simply
> revolting.

---

[16]Ms. McGraw also suffered from contractures requiring the physical therapist to lift her legs to stretch out the otherwise spasmed muscles.

[17]The Fourth Circuit noted, Travelers' "fiduciary" viewed himself as a "'supporter' of Travelers' 'legal department' and 'field office.'" ***Bedrick v. Travelers Ins. Co.***, 93 F.3d 149, 154 (4th Cir. 1996).

*Id.* at 153 (italics in original) (bold and italics added).

At least in ***Bedrick,*** there had been some minimal communication between Ethan's treating physicians and physical therapist and the insurer's representative.  Here, Dr. Shook emphatically "seriously doubted" he had talked to anyone or read anything.  It is uncontroverted each episode of physical therapy or home nursing services was ordered to help Ms. McGraw ***not to get worse***.[18]  Asked whether it was not reasonable to conclude treating someone with physical therapy with no noticeable improvement established the treatment was not medically necessary, Dr. Landstrom responded, "Except you never know whether it's going to work until you try it.  And it's still treatment, the disease may be incurable but it's still treatable."  In an effort to dispel Prudential's insistence on distinguishing between physical therapy as "medically beneficial," as it believed was present here, as opposed to "medically necessary," Dr. Lawton analogized the use of physical therapy in the MS setting to treating malignancies with chemotherapy.  He observed that many people suffering from certain incurable cancers are routinely given chemotherapy, a treatment which in some instances makes the patient worse and often has no effect on the progress of the disease at all.  No one, however, he ventured, would characterize the chemotherapy as not medically necessary.

_____

[18]Gary McGraw testified in his deposition that despite his wife's physical debilitation, she still had good muscle tone giving him hope that intensive physical therapy would preserve and enhance her strength.

So, if we refer say to her admission in '93, I'm not trying to tell anybody it helped her, because I don't think there's any evidence for that. I think it was an appropriate thing to try and would be analogous to a patient with a malignancy being admitted to the hospital for chemotherapy that in retrospect produced no improvement in the cancer. I think that's done all the time.[19]

As we read the record, it is apparent Prudential's fiduciary, who must act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits ... and defraying reasonable expenses," 29 U.S.C. § 1104(a)(1)(A), made the discretionary decision "to give up on" Ms. McGraw. *Bedrick*, 93 F.3d at 153. Most egregiously, there is no indication in this record that the decision was ever based on a review of *Ms. McGraw's* medical records. Clifton Abel, Prudential's regional appeals coordinator, testified all the ballots voting to deny the Baptist claim were submitted before Prudential had Plaintiff's Exhibit 17B. He opined that a claim could reasonably be denied without a review of the records if the medical director called the treating physician. Dr. Shook "seriously doubted" he talked to anyone, and Dr. Lawton stated he

---

[19]In the second denial of benefits for the inpatient care at Baptist Medical Center, Dr. Lawton received authorization for the admission from Prudential on May 11, 1993. Although Dr. Lawton ordered a three-week course of therapy, Ms. McGraw was discharged on May 21, 1993. One patient note stated the discharge was "due to lack of progress." There is conflict in the record over the reasons for the discharge. Gary McGraw and Ms. McGraw testified hospital staff told them Prudential wouldn't pay so she had to be discharged. Dr. Lawton qualified her "lack of progress" with the fact that at the time of her admission she suffered from a severe bladder infection adding to her discomfort and ability to respond positively to the exercise regime. There are notes in her medical chart referring to how disheartened Ms. McGraw appeared because of her continuous difficulties with Prudential.

was never called by anyone at Prudential to discuss the care he had ordered. Even Dr. Lewis testified, while she qualified the need for out-patient physical therapy as medically necessary in the Baptist Center claim, that decision, she stated in her affidavit, "was probably influenced by the fact that there had been a delay in the decision-making process." Indeed, if there were no records in the appeal file, Dr. Lewis, a pediatrician, would be distinctly disadvantaged in adjudging the medical necessity of this treatment for this particular patient.[20]

As a salaried employee of the Central Oklahoma Medical Group, which had an exclusive contract with PruCare, Prudential's HMO "**product**," Dr. Shook understood every "medical" decision would impact Prudential's profitability. We therefore will accord less deference to that decision "to the degree necessary to neutralize any untoward influence resulting from the conflict." *Bailey v. Blue Cross & Blue Shield of Va*, 67 F.3d 53, 56 (4th Cir. 1995) (quoting *Doe v. Group Hospitalization & Medical Servs.*, 3 F.3d 80, 87 (4th Cir. 1993)). At each level of review, Prudential's fiduciaries did not evaluate the claims for Ms. McGraw's physical therapy "solely in the interest of the participants" as required under 29 U.S.C. § 1104(a)(1)(A), but more to reflect "defraying reasonable expenses." 29 U.S.C. § 1104(a)(1)(A). "There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick*, 93 F.3d at 154.

---

[20]An article on MS included in the Appendix states: "The onset of symptoms typically occurs between the ages of 15 and 45 years. *The disease is rare in children* ...." *Multiple Sclerosis*, Chapter 22, at 451 (emphasis added).

Because the fiduciary unreasonably interpreted the Plan, we therefore hold the denial of benefits for the two claims reviewed was arbitrary and capricious and reverse the contrary conclusion of the district court.

### III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

ERISA contains no explicit exhaustion requirement although we have observed "exhaustion of administrative (i.e., company-or plan-provided) remedies is an implicit prerequisite to seeking judicial relief." *Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir. 1990); *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 467 (10th Cir. 1997).  This proposition derives from the exhaustion doctrine permeating all judicial review of administrative agency action, *Communications Workers of Am. v. AT&T*, 40 F.3d 426, 432 (D.C. Cir. 1994), and aligns with ERISA's overall structure of placing primary responsibility for claim resolution on fund trustees.  29 U.S.C. § 1133.  Otherwise, premature judicial interference with the interpretation of a plan would impede those internal processes which result in a completed record of decision making for a court to review.  *Id.*  Nevertheless, "[b]ecause ERISA itself does not specifically require the exhaustion of remedies available under pension plans, courts have applied this requirement as a matter of judicial discretion."  *Id.*  In exercising that discretion, district courts have eschewed exhaustion under two limited circumstances: first, when resort to administrative remedies would be futile; or, second, when the remedy provided is inadequate.  *Counts v. American General Life & Acc. Ins. Co.*, 111 F.3d

105, 108 (11th Cir. 1997); *Communications Workers*, 40 F.3d at 432.  In this case, the district court refused to credit Ms. McGraw's "bare allegation" of futility with the sufficiency necessary to meet the former exception and found Prudential did not obstruct her attempt to obtain review, interpreting the latter exception as requiring proof of a lack of access to an internal review procedure.[21]  To support its analysis, the court relied on *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397 (7th Cir. 1996), and *Makar v. Health Care Corp. of Mid-Atlantic*, 872 F.2d 80 (4th Cir. 1989), and rejected Ms. McGraw's contention that resorting to internal review procedures would have been futile. That is, it declined to exercise its discretion to excuse the failure to exhaust.  We may disturb that conclusion only if it represents a clear abuse of discretion.  *Wilczynski*, 93 F.3d at 401.

In *Wilczynski*, the district court dismissed plaintiff's claim for disability benefits upon finding her bare allegation it would be futile to pursue any internal review process was insufficient.  The Seventh Circuit, however, disagreed.  Citing the allegation of futility in her complaint, that defendant steadfastly refused to extend COBRA benefits in the face of plaintiff's multiple claims, the reviewing court noted, in fact, plaintiff's complaint had been filed two months before defendant denied COBRA benefits and after the parties had been embroiled in an embittered discovery battle related to her claims.

---

[21]Ms. McGraw did not attempt to establish Prudential's three level review process was inadequate.

- 25 -

The court held on that basis, "[a]t this stage of the litigation, therefore, these allegations are sufficient to bring her claim within the futility exception to the administrative exhaustion requirement." *Id.* at 405.

In *Makar,* the Fourth Circuit concluded there was no factual record at all to review, plaintiffs having filed no grievance related to their one claim and instead instituted suit in county court for monies due. Thus, the court observed, "[t]he [] plan fiduciaries have not had the opportunity to define the relevant issues or to apply the relevant plan provisions." 872 F.2d at 83. The reviewing court then vacated the dismissal order and remanded the case for the district court to dismiss it without prejudice so that plaintiffs could proceed administratively.

The record before us is wholly different from these two cases. Although we recognize the futility exception is limited to those instances where resort to administrative remedies would be "clearly useless," *Communications Workers*, 40 F.3d at 432 (citations omitted), we believe this record clearly establishes futility in numerous respects.

First, as acknowledged by Dr. Lewis, claims that Ms. McGraw pursued were belatedly processed and review delayed. On different occasions, Prudential might send an EOB, explanation of benefits, directly to Mr. McGraw or communicate only with Ms. McGraw's treating physician or attorney. Delays caused one denial process to overlay another, making it daunting to extricate the route of one review procedure from another. Indeed, there are several references in the record to Prudential's failure to review a claim

within the time limits necessary for Ms. McGraw to be able to submit it for Medicare supplemental payment. Nevertheless, while the requests and denials were being exchanged, treating doctors, for example at HealthSouth Rehabilitation Center, attempted to communicate with Prudential the physical therapy regime was not "respite care," to "give her family a break," as Prudential characterized it, but as Dr. Chadwell, her physical therapist stated, care to make her life "as good as possible."

Second, as previously noted, in the face of Ms. McGraw's treating neurologist and urologist's opinions the services prescribed were medically necessary, Prudential followed its own interpretation of the Plan isolated from any understanding of the treatment needs of the Plan's beneficiary, Ms. McGraw. For example, on two unexhausted claims included in her lawsuit, Prudential's representatives insisted the catheterizations for which Dr. Rittenhouse sought home nursing care could be done by a family member or neighbor.[22] The record does not disclose the availability of those "family members" or the procedure Ms. McGraw should follow to ask a "neighbor" to insert a sterile catheter into her ureter. A social services assessment written in 1992 at HealthSouth Rehabilitation stated Ms. McGraw's parents were retired and traveled often, while her brother lives in Washington state. Her husband, it noted, also traveled for

_____

[22]In her deposition, Ms. McGraw described a visit from a Prudential representative, probably a case manager, who told her "a monkey could do that [insert a catheter], and I said, well, I'm not a monkey and I can't do it."

Lifefleet. Again, Prudential has demonstrated the chasm in its understanding of Ms. McGraw's medical needs rendering further effort for review futile.

Third, we would note Ms. McGraw's lawsuit began as a state claim for damages for Prudential's bad faith breach of an insurance contract. Once the district court correctly held ERISA applied, it was within its discretion to consider the full record in light of ERISA's remedial structure and evaluate Ms. McGraw's allegations from that perspective. Our odyssey through this record makes clear Prudential never evaluated Ms. McGraw's individual case but rubber stamped the "nature" of her condition and denied each subsequent claim arising from her MS.

It is beyond cavil the record before us, then, under *Wilczynski* and *Makar*, fleshes out Mr. McGraw's statement "at some point it was obvious that it wasn't going to do any good to go any further if there were appeal processes, and that's when we decided to talk to lawyers...." The district court, therefore, abused its discretion in holding three of Ms. McGraw's claims had not been exhausted by internal review. We remand those claims for the district court to determine whether Prudential's denial of their payment was arbitrary and capricious consistent with our guidance.

In sum, we **AFFIRM** the district court's holding ERISA governs this action. We **REVERSE** its conclusion the denial of benefits was not arbitrary and capricious and **REMAND** for its examination of the claims submitted for HealthSouth Rehabilitation,

Hillcrest Home Healthcare, and Hillcrest Health Center under the arbitrary and capricious

rubric set forth above.