Mark A. BUCHANAN, Plaintiff,

v.

RELIANCE STANDARD LIFE INSURANCE COMPANY, Defendant.

No. 96–2553–JWL.

United States District Court, D. Kansas.

April 9, 1998.

Elizabeth A. Boldt, McAnany, Van Cleave & Phillips, P.A., Lenexa, KS, Carl A. Gallagher, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Mark A. Buchanan, Plaintiff.

Richard N. Bien, James A. Durbin, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, for Reliance Standard Life Insurance Company, Defendant.

### *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

Plaintiff Mark Buchanan filed this suit seeking review of the denial of insurance benefits by defendant Reliance Standard Insurance Company, pursuant to the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Defendant denied plaintiff's claims for benefits under the governing policy's "loss of sight" and "permanent total disability" provisions. The matter is presently before the court on defendant's motion in limine regarding the scope of the court's review (Doc. 31) and defendant's motion for summary judgment (Doc. 30).[1] For the reasons set forth

---

1. Plaintiff filed the present suit on December 19, 1996. On April 18, 1997, the court granted the parties' joint motion for a stay to permit defendant to conclude its administrative review. On

below, the motion in limine is granted in part and denied in part. Because the court concludes that defendant's denial of benefits was not arbitrary and capricious, the court grants defendant's motion for summary judgment, and plaintiff's claims are hereby dismissed.

## I. Facts[2]

The insurance policy at issue here was purchased for plaintiff by his employer, Ingersoll–Rand, for whom plaintiff worked as a machinist. The policy contained the following "loss of sight" provision:

> LOSS OF LIFE, LIMB, SIGHT, SPEECH OR HEARING INDEMNITY: If an injury results in any one of the following specific losses within one year from the date of accident, [defendant] will pay the benefit specified....
>
> . . .
>
> Loss of One Member ............ One–Half the Principal Sum ...
>
> "Member" means hand, foot or eye. "Loss" means, ... with regard to eye, entire and irrecoverable loss of sight....

The policy also contained the following "permanent total disability" provision:

> PERMANENT TOTAL DISABILITY: [Defendant] will pay up to the Principal Sum to the Insured if all of the following occur:
>
> (a) he becomes totally disabled within 365 days of the date of the accident;
>
> (b) the total disability continues for a period of 12 consecutive months after onset;
>
> (c) it is shown by proper medical authority at the end of these 12 months that disability is continuous and permanent.
>
> This benefit will be less any benefit paid or payable as the result of the same accident.
>
> "Total Disability" means he's not able, due to injury, to perform all of the material duties of his occupation for a period of 12 months in a row. After 12 months, Total Disability means the same as "Permanent Total Disability."

> "Permanent Total Disability" means he's not able to perform the duties of any occupation for which he is suited by education, training or experience.

The applicable "Principal Sum" in this case is $111,200. The policy required that defendant make payment on a claim "upon receipt of due written proof of such loss."

On July 4, 1994, plaintiff suffered an injury to his right eye while working on a fireworks display for the City of Baxter Springs, Kansas. In June of 1995, plaintiff submitted a claim for benefits under the "loss of sight" provision. On the claim form, plaintiff noted that he last worked on July 1, 1994, listing "eye injury (depth perception and near vision)" as the reasons for not returning. Plaintiff's claim included a signed statement from his ophthalmologist, Dr. E.L. Jordan, dated June 19, 1995. In response to a question on the statement form to be answered "[i]f the loss of sight is partial, but irrecoverable," Dr. Jordan listed plaintiff's right eye vision as "counts fingers" uncorrected, "20/100 +" corrected, as of an examination on June 13, 1995. Dr. Jordan answered "yes" to the question, "Do you believe vision can be restored in whole or in part by treatment or operation?"

On October 13, 1995, Dr. Jordan sent defendant a letter in response to written questions posed by Beth Holcombe, a supervisor with defendant. In his response, Dr. Jordan stated that plaintiff's best-corrected visual acuity in his right eye was 20/100 at his last examination on June 13, 1995. Dr. Jordan stated plaintiff's injuries as follows:

> Examination at that time was unchanged from his previous examination and he appears relatively stable at this time, although a traumatic cataract that he is developing appears to be somewhat worsening. He continued to have vitreous debris inferiorly in his right eye but no retinal detachment or hole was seen. A traumatic cataract had formed in the right eye, posterior subcapsular and anterior subcapsular type. Iris sphincter

---

January 23, 1998, defendant filed the instant motions.

2. The facts are derived from the administrative record filed by the parties, as defined below by the court.

rupture and transillumination defects were present in the right eye. A superior iris dehiscence was noted in the right eye. These other injuries have been present since the initial visit.

Dr. Jordan noted that plaintiff would probably require cataract surgery at some point. Dr. Jordan also stated, in response to a specific question, that "[t]his patient does not have entire and irrecoverable loss of sight."

Dr. Jordan provided his records from his many examinations of plaintiff. Those records generally show a best corrected vision of between 20/80 and 20/100. Dr. Jordan also included a letter of consultation, dated September 12, 1994, from Dr. Gary Mehlhorn, who examined plaintiff on September 9, 1994. Dr. Mehlhorn discussed the particular injuries to plaintiff's eye and noted a potential risk of serious glaucoma and retinal detachment. Dr. Mehlhorn noted that plaintiff was having difficulty with his near vision, which was interfering with his depth perception.

On October 26, 1995, defendant denied plaintiff's claim for "loss of sight" benefits by letter from Shawn Abner, an examiner with defendant's claims department. After noting the applicable policy provisions, the letter stated as follows:

> We obtained medical records from Dr. Jordan which reveal that your current visual acuity is 20/100 and you have decreased vision in your eye as a result of the accident. It also reveals that your loss is not considered total and irrecoverable as stipulated in our contract. Consequently, we must inform you that this claim is being denied.

In December of 1995, plaintiff filed a claim with defendant for disability benefits based on the injury to his right eye. Again, the claim included a signed statement from Dr. Jordan, dated December 5, 1995. Dr. Jordan stated: "Patient can't see well out of right eye, has poor depth perception, and cannot accommodate with OD." Dr. Jordan listed plaintiff's best-corrected visual acuity as 20/100 −. In response to the question, "Is patient now totally disabled?", Dr. Jordan checked "no" with respect to "any occupation", and "yes" with respect to plaintiff's

"regular occupation". With respect to "any occupation", Dr. Jordan listed October 4, 1994, as the date on which plaintiff was able to go to work.

Plaintiff sent defendant a letter on December 8, 1995, concerning his disability claim. With respect to his career as a machinist, plaintiff stated as follows:

> I began my career as a machinist in 1976 while I was still in high school. My father was a machinist all of his life and owned his own business. That is where I started to learn the trade. In 1977, when I turned 18, I quit school to work full time. I decided I didn't need more education, since I already knew what I would be doing the rest of my life. I was a machinist. That is all I know. That is all I have ever done.

Plaintiff recalled that Dr. Jordan had told him that his near vision and depth perception were "gone for good," and that he should not work around dangerous machinery. Plaintiff enclosed the letter of consultation from Dr. Mehlhorn, as well as a letter dated November 18, 1994, written by Dr. Jordan to a Mr. Cottrell. In that letter Dr. Jordan recommended that plaintiff not return to work as a machinist because plaintiff's "visual acuity [was] not sufficient to provide him with good stereopsis depth perception."

On January 21, 1996, plaintiff completed and signed an "occupation/education" questionnaire from defendant. With respect to his former duties as a machinist, plaintiff noted that he was "required to have the ability to read blueprints, use various types of measuring devices, and have a basic understanding of trigonometry," and that he had a knowledge of different types of machines, metals, and plastics. Plaintiff described his duties in his then-current job of master control operator for a television station as follows:

> Insert names and titles of people and places shown on local newscast. Load and unload video tapes from tape machines. Push buttons to change from program to commercial and back. Maintain log of everything that is broadcast, tape satellite feeds for later broadcast. Maintain transmitter log.

Upon request of Ms. Abner, Dr. Mehlhorn filled out a physical capabilities checklist on plaintiff, on February 26, 1996. Dr. Mehlhorn indicated that plaintiff did not have any physical limitations, but he noted that he hadn't seen plaintiff for more than one year. The record also contains the results of a computer search of occupations, dated April 2, 1996, which noted that a total of 140 occupations met certain search criteria.

On behalf of defendant, Ms. Abner denied plaintiff's claim for disability benefits by letter to plaintiff dated May 2, 1996. After reviewing the policy's "permanent total disability" provisions, Ms. Abner stated:

The information on file reveals that you suffered facial and ocular trauma when a fireworks display that you were working on exploded. Our file also indicates you were previously employed as a machinist and currently employed as a Master Control Technician for a TV station. We have performed a Transferable Skills Analysis based on your educational background, training and experience. It was determined that your current job is actually more technical than your previous job although it pays less money. Since you are currently *able* to work with your limitations, you are not eligible to receive benefits under this policy, as you are not considered "Permanent and Totally Disabled" [sic] according to this contract. Therefore, we regret to inform you that this claim is being denied.

On June 25, 1996, plaintiff's attorney sent defendant a letter seeking review of defendant's denial of both claims. The attorney asked to review the documentation supporting the transferable skills analysis (TSA) on which defendant relied. The attorney argued that plaintiff was disabled under the policy because he could not perform the duties of his usual job of machinist. The attorney further argued that plaintiff had suffered an entire and irrecoverable loss of sight because he had lost—and could not regain—practical use of the eye.

On August 5, 1996, Ms. Abner responded to the letter and sent plaintiff's attorney a copy of the TSA conducted for plaintiff. The TSA stated that it was based on plaintiff's work history and the physical capabilities form completed by Dr. Mehlhorn. The TSA listed plaintiff's aptitudes as culled from his employment history and concluded that, based on plaintiff's "work history, current physical capacities, worker profile and transferable skills," alternate positions existed for plaintiff. The TSA listed five particular occupations, although it noted that no positions with directly transferable skills had been located; thus, some on-the-job training would be required.

In a letter accompanying the TSA, Ms. Abner noted that the TSA "identified several occupations from the Department of Labor's Dictionary of Occupational Titles for which [plaintiff] is suited by his education and vocational level, and are within his physical capacities." Ms. Abner repeated defendant's conclusion that plaintiff's loss of sight was not total and irrecoverable. Finally, Ms. Abner stated that "[b]ased on the information presented thus far, [defendant's] determination to deny [plaintiff's] claim for Accidental Dismemberment benefits and Permanent & Total Disability Benefits is correct," although she invited plaintiff's attorney to submit any additional documentation and information supporting plaintiff's claims.

On August 20, 1996, plaintiff's attorney again wrote to defendant. With respect to the loss of sight claim, the attorney argued that an enclosed report, by Dr. Jeffrey M. Brick, confirmed that plaintiff had not had any practical use of his eye since his accident. The attorney also argued that Dr. Jordan's letter of October 13, 1995 was consistent with that conclusion, and that the relevant terms had not been properly defined for Dr. Jordan when he stated that plaintiff did not suffer an entire and irrecoverable loss of sight. The attorney also raised a number of issues with respect to the TSA, specifically concerning (1) the lack of support for the statement that plaintiff's current job was more technical; (2) the use of machinist as plaintiff's occupation instead of tool and die maker; (3) the above-average aptitudes used for spatial and form perception and finger and manual dexterity, in light of plaintiff's loss of binocularity; (4) the lack of detail regarding the listed alternate positions; (5) the use of Dr. Mehlhorn,

an ophthalmologist, for the physical capabilities checklist, and the failure to account for plaintiff's back problems; and (6) the conclusion that plaintiff was not permanently disabled despite the necessity for additional training for any alternate job.

In the accompanying report, dated August 9, 1996, Dr. Brick related the results of his examination of plaintiff on August 7, 1996. Dr. Brick noted that plaintiff had not been able to return to work as a machinist because of "his lack of binocularity due to the decrease in vision in the right eye." Dr. Brick stated that plaintiff had a best corrected vision of 20/200. Dr. Brick noted plaintiff's irregular and non-reactive pupil, the ripping away of plaintiff's iris from the root, lens ruptures, and a moderate cataract. A test revealed that plaintiff's vision would be 20/100 without the cataract. Dr. Brick concluded as follows:

> It was my impression that [plaintiff] has suffered a severe injury to his right eye resulting in significant loss of usable vision. As his eye stands now, it would be very difficult for him to use the eye for any meaningful vision and he certainly has lost his binocularity because of this. If the cataract were removed, and this is by no means an easy surgery, there is a chance of obtaining better vision, but I doubt that his binocularity will return because of aphakic or pseudophakic status of the eye after surgery.

The record includes a letter, dated September 27, 1996, sent to Thomas Hardy, defendant's vocational services manager, from Beth Darman, an outside vocational case manager, who conducted the TSA. In the letter, Ms. Darman responded to the points raised by plaintiff's attorney concerning the TSA. Ms. Darman stated that she used Dr. Mehlhorn's checklist because that was the only medical information available to her, with the exception of the information concerning plaintiff's sight. Ms. Darman explained in detail how plaintiff's aptitudes were derived from his position as machinist, in accordance with the Department of Labor Dictionary. She stated that using tool and die maker instead of machinist would not affect the TSA. She agreed that the loss of binocularity would affect spatial perception, but she did not agree that other aptitudes would be affected. She stated that using a lower spatial perception aptitude would change the TSA, but there were still a number of transferable jobs available to plaintiff. She noted that only machine shop jobs, which plaintiff can no longer perform, would have directly transferable skills, and that other positions would require some on-the-job training. Nevertheless, Ms. Darman concluded that plaintiff had the basic education, training, and experience to perform those occupations.

On October 3, 1996, Paul Gemmill, a claims manager for defendant, sent plaintiff's attorney a letter upholding the denial of plaintiff's claims. In addressing the disability claim, Mr. Gemmill restated Ms. Darman's lengthy responses to the attorney's concerns about the TSA. Mr. Gemmill stated:

> Although [plaintiff] may not be able to return to his former job as a Machinist or Tool and Die Maker due to his loss of visual acuity, the evidence certainly indicates that he is able to perform the work of other occupations for which he is suited. This is clearly demonstrated by the fact that [plaintiff] had returned to work as a Master Control Operator, an occupation which would require extensive on-the-job training and instruction to acquire the skills and knowledge required to perform the duties of this position and occupation.

Mr. Gemmill concluded that the record did not support plaintiff's claim that he was permanently and totally disabled.

Mr. Gemmill also affirmed the denial of "loss of sight" benefits. He noted Dr. Jordan's finding that plaintiff's best corrected visual acuity was 20/100 on June 13, 1995, and Dr. Jordan's statement that plaintiff did not have entire and irrecoverable loss of sight. Mr. Gemmill also stated that, although plaintiff's sight may have been worse when Dr. Brick examined plaintiff on August 7, 1996, plaintiff did not suffer an entire and irrecoverable loss of sight within one year of the accident, as required in the policy. Finally, Mr. Gemmill stated that there was no evidence that plaintiff's sight decreased between Dr. Jordan's last examination of plain-

tiff on June 13, 1995, and the one-year anniversary of the accident on July 4, 1995.

On December 3, 1996, plaintiff's attorney sent defendant a letter, in which the attorney suggested that defendant's review of the two claims had been inadequate and inquired about further administrative remedies. The attorney enclosed an assessment by Michael Dreiling, a vocational rehabilitation counselor. The attorney argued in the letter that because plaintiff could not perform any occupation for which is physically qualified without extensive vocational training, plaintiff was unable to work in any job for which he is suited by education, training, and experience. The attorney again questioned the use of Dr. Mehlhorn's physical capabilities checklist, and he noted plaintiff's back problems. The attorney also noted that Dr. Jordan had restricted plaintiff from operating dangerous machinery because of depth perception and near vision problems. Finally, the attorney demanded payment of $111,200 in benefits, and stated that he would file suit if he did not receive a response from defendant by December 18, 1996.[3]

The vocational assessment was sent by Mr. Dreiling to the attorney on November 26, 1996. Mr. Dreiling indicated that he interviewed plaintiff on October 31, 1996. Mr. Dreiling noted that plaintiff had earned his GED diploma in 1981. He also noted plaintiff's past back problems, although plaintiff reported to him that no permanent restrictions had been placed on him because of those problems. Mr. Dreiling then reviewed plaintiff's work history, including his job as a master control operator at a television station after the accident and similar jobs since. Mr. Dreiling stated that plaintiff's first master control operator position was an "unskilled job", "based upon two weeks of orientation to learn the job." Mr. Dreiling stated that the five jobs specifically listed in the TSA would be too dangerous for plaintiff and that plaintiff did not have the necessary training or experience at any rate. Mr. Dreiling concluded as follows:

In summary, it is my vocational opinion that this gentleman does not have transferable skills to other occupations consistent with his medical problems, educational background or work experience. The jobs which have been suggested for this gentleman in terms of transferable skills are not appropriate for him. His present employment is entry level unskilled and is currently paying him at a minimum wage level.

In response to the attorney's letter, an independent review of the denial of plaintiff's two claims was conducted by Peter Schiller, the manager of defendant's quality review unit. Mr. Schiller elicited a report from Dr. Elizabeth Genovese–Stone, defendant's medical director. In her report, Dr. Genovese–Stone reviewed the various doctors' findings concerning plaintiff's eye injury. She noted Dr. Jordan's opinion that plaintiff could not do work requiring good stereopsis depth perception and Dr. Brick's conclusions that the condition of plaintiff's pupil "would preclude any return of binocularity," but that cataract surgery could lead to a "chance" of obtaining better vision. Dr. Genovese–Stone concluded as follows:

I can not state that the loss of sight is total and irrecoverable as the records indicate that [plaintiff's] sight may improve if he has a cataract operation. On the other hand, I do feel that his sight will not return to what it was previously, or that binocular vision will be restored.

The doctor recommended that an independent medical examination (IME) be conducted by an ophthalmologist. She also stated her belief that plaintiff was not permanently totally disabled, but she preferred to leave that issue for a vocational expert.

On May 19, 1997, Dr. Terry Rothstein conducted the IME of plaintiff. Dr. Rothstein wrote a report dated May 28, 1997, based on that exam and his review of plaintiff's records. Dr. Rothstein opined that plaintiff's vision was 20/100 at the end of the one-year period beginning with the accident.

3. Defendant notes that, on the first page of this letter, the attorney stated that he would file suit by December 1, 1996, if he did not receive a response by November 27. It is clear that the attorney did not intend that these dates control, given the December 3 date of the letter and the later dates given in the letter's conclusion.

He noted that plaintiff's pupil would not constrict normally, but that such condition should not have affected central acuity, although it "could result, along with the cataract, in a great deal of glare." Dr. Rothstein noted that plaintiff's visual acuity deteriorated to 20/200 by August of 1996. He stated:

> [Plaintiff's] visual functioning would have been affected, at this time, by his traumatic cataract with a resultant poor visual acuity and an absence of depth perception so that he would not be able to judge distances. This absence of depth perception would have been present from the time of the initial injury on 04 July 1994.

Finally, Dr. Rothstein stated that there was a potential for visual acuity of 20/70 in the eye after surgery.

Mr. Schiller also solicited a response from Mr. Hardy, defendant's vocational services manager. Mr. Hardy agreed that Dr. Mehlhorn's checklist should not have been considered and that a heavy exertion level should not therefore have been used in the TSA. Mr. Hardy recommended using a medium level because plaintiff had demonstrated that he could perform at that level as a machinist. Mr. Hardy also noted that he disagreed with Ms. Darman's findings, and that if proximity to moving machinery were considered, all but one of the specific positions listed by Ms. Darman would be eliminated. Mr. Hardy also stated that the TSA should not be based on plaintiff's master control operator position. Mr. Hardy then stated that he had performed a new TSA, and that eliminating the master control operation position from the equation eliminated only 6 occupations. Mr. Hardy stated that 25 other occupations remained that could be performed without proximity to moving parts. Mr. Hardy concluded:

> It is my professional opinion the [plaintiff] can indeed perform the duties of other occupations by virtue of his training, education or experience. There were problems with the prior TSA that was performed. Even when prior problems were rectified, a substantial list remains that can be performed by [plaintiff].

Mr. Hardy included with his report detailed information concerning wages and duties for the occupations yielded by the TSA.

Mr. Schiller upheld the denial of plaintiff's claims by letter dated June 16, 1997. With respect to the "loss of sight" claim, Mr. Schiller referred to the October 3, 1996 letter from Mr. Gemmill. Mr. Schiller noted that Dr. Jordan found that plaintiff did not have good depth perception, but he further noted that Dr. Jordan had not shown concern that plaintiff could not perform other jobs not requiring good depth perception or stated that plaintiff's vision in his right eye was of no use. Mr. Schiller stated that Dr. Jordan had found a 20/100 acuity and that there was no indication that the loss of sight was entire within one year of the accident. Mr. Schiller noted that plaintiff's sight had deteriorated to 20/200, but not until more than one year after the accident. Mr. Schiller concluded that plaintiff's sight was not irrecoverable because both Dr. Brick and Dr. Rothstein indicated that surgery could improve vision to 20/100 or 20/70 or even better.

Mr. Schiller also concluded that plaintiff was not entitled to disability benefits. Mr. Schiller pointed to Mr. Hardy's TSA, which indicated that, even with heavy exertion level occupations eliminated, 25 occupations remained for plaintiff, which occupations would not require extensive vocational training. Mr. Schiller also noted that plaintiff had been working as a master control operator since October of 1994. Thus, Mr. Schiller concluded that there was not satisfactory proof that plaintiff was "unable to perform the duties of any occupation for which he is suited by education, training, or experience." Finally, Mr. Schiller concluded that plaintiff's disability was not permanent because his vision could increase with surgery.

## II. Standard of Review

Plaintiff seeks review of defendant's denial of his claims under the policy. "[A] denial of benefits under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which event an arbi-

trary and capricious standard is appropriate. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Here, both parties agree that the policy grants defendant discretionary authority and that the arbitrary and capricious standard is therefore appropriate in this case. *See Caldwell v. Life Ins. Co. of N. Am.,* 959 F.Supp. 1361, 1365 (D.Kan.1997) (policy requiring insurer to pay when it receives "due proof" of entitlement to benefits conveys discretionary authority and invokes the arbitrary and capricious standard of review).

The court agrees with plaintiff that the court's deference to defendant's decisions is not unlimited, given defendant's conflict of interest in this matter. If an ERISA plan gives discretion to a fiduciary acting under a conflict of interest, that conflict may be a factor for the court's consideration. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. The Tenth Circuit has held that "the degree of deference to accord such a decision will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible." *McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1258 (10th Cir. 1998); *accord Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir.1996) (level of deference to the decision is decreased in proportion to the seriousness of the conflict).

In the present case, a conflict of interest is present because every decision in this case by defendant in determining whether it would pay plaintiff benefits affected defendant financially. *See McGraw,* 137 F.3d at 1258–59 ("[B]ecause every exercise of discretion impacts Prudential financially, filling or depleting its coffers, we afford its decisions less deference depending on the degree of conflict manifest."). Thus, the court affords defendant a lesser amount of deference.[4]

Accordingly, the court must determine whether defendant's denials of plaintiff's

claims were arbitrary and capricious. Indicia of arbitrary and capricious actions include a lack of substantial evidence, a mistake of law, and bad faith. *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F.2d 377, 380 n. 4 (10th Cir.1992). "The touchstone of [the court's] inquiry is whether defendant's interpretation of its plan is reasonable." *Semtner v. Group Health Serv. of Okla., Inc.,* 129 F.3d 1390, 1393 (10th Cir.1997) *see McGraw,* 137 F.3d at 1259 ("A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms."); *Chambers,* 100 F.3d at 827 (determination was "reasonable" and therefore was not arbitrary and capricious).

### III. Scope of Review / Motion in Limine

In its motion in limine, defendant seeks to limit the evidence before the court to those documents stipulated by the parties as part of the administrative record, namely, exhibits 1–92, 95–98, and 101 from the record filed with the court. The court agrees that, in general, plaintiff may not submit additional evidence that was not before defendant when it made its claims decisions. *See Sandoval,* 967 F.2d at 380 ("In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision.").

Plaintiff argues that exhibits 93 and 94 should be considered part of the administrative record in this case. Exhibit 93 is a disability certificate signed by Dr. Jordan on October 3, 1994, certifying that plaintiff had recovered sufficiently to be able to return to work on October 4, 1994, with the restriction of "no operating of dangerous equipment due to depth perception and near vision." Exhibit 94 is a memo from a doctor dated August 9, 1991, noting back problems in plaintiff.

The court denies defendant's motion with respect to these two documents. The letter from plaintiff's attorney dated December 3,

---

4. Plaintiff's argument that Mr. Gemmill's review of denials that he had previously approved indicates a conflict of interest is without merit. Defendant is not required to conduct an independent review of its own decisions. Nevertheless, Mr. Schiller, who had no prior involvement in the case, conducted just such a review for defendant.

1996, which is part of the administrative record as exhibit 7, referred to both documents and indicated that the documents were enclosed with the letter. Defendant points to the deposition testimony of Mr. Gemmill, who stated that he had not seen these documents. From the time of the attorney's letter, however, review of plaintiff's claims was conducted by Mr. Schiller. Moreover, defendant will not suffer prejudice from the court's consideration of these documents. It is not disputed that plaintiff may no longer work as a machinist. Nor is it disputed that plaintiff suffered back problems, and exhibit 94 does not relate those problems to plaintiff's ability to work.

■ Exhibits 99 and 100 are depositions of Mr. Gemmill and Mr. Schiller. These depositions, taken on November 4, 1997, were certainly not part of the record before defendant. Defendant argues therefore that they may not be considered. The court does not agree that such depositions are not relevant for any purpose. It is clear that new evidence relating to the merits of plaintiff's claims—for instance, another's doctor's opinion—could not be considered now. The court believes, however, that plaintiff is not precluded from submitting new evidence on the narrow issue of the *manner* in which defendant made its decision, so that the court may determine whether defendant acted arbitrarily in making that decision. *See Caldwell v. Life Ins. Co. of N. Am.*, 165 F.R.D. 633, 637 (D.Kan.1996) (scope of review precludes discovery only on the merits of the claim; a plaintiff may be entitled to discovery on the issue of the compilation of the record); *see also Chambers*, 100 F.3d at 824 (distinguishing case permitting courts to look beyond the record to review the administrator's interpretation, but not to review the facts underlying a claim; issue in case at bar concerned the facts of the claim).[5] The court will therefore consider the depositions only to the extent they bear on the procedure by which defendant reached its decision; it will not consider testimony relating to the substance of the claims or decision. Thus, with respect to

exhibits 99 and 100, defendant's motion is granted in part and denied in part.

■ Finally, defendant's motion is granted with respect to the letter and affidavit attached to plaintiff's brief, as well as the medical definitions provided by plaintiff in the brief. Those materials and definitions were not presented to defendant in its review and so may not be considered by the court.

## IV. Loss of Sight Claim

Plaintiff argues that he did in fact suffer an "entire and irrecoverable loss of sight" in his right eye and that he is therefore entitled to benefits under the terms of the policy. The court has thoroughly reviewed the entire record, however, and it concludes that defendant's determination that plaintiff did not suffer such a loss within one year of the accident was considered and eminently reasonable. Even given the conflict of interest here and the diminished amount of deference therefore afforded by the court, defendant's decision was not arbitrary and capricious. Accordingly, defendant is entitled to summary judgment on the "loss of sight" claim.

Defendant had information from five doctors before it in considering this claim. Dr. Jordan, who saw plaintiff for the first year after the accident, found that plaintiff had a best corrected acuity of 20/100 and had problems with depth perception and near vision. Dr. Jordan stated specifically that plaintiff did not have "entire and irrecoverable loss of sight." Dr. Mehlhorn also indicated that plaintiff had problems with near vision and depth perception. Dr. Brick found that plaintiff had 20/200 best corrected vision, which could be reduced to 20/100 after cataract surgery. Dr. Brick stated that plaintiff had a "significant loss of usable vision," that "it would be difficult for him to use the eye for any meaningful vision," and that plaintiff had lost binocularity. Dr. Brick stated that surgery could help plaintiff's vision, but he doubted that binocularity would return. Dr. Genovese–Stone stated that she could not say that plaintiff's loss of sight is total and irrecoverable, although she agreed that binocular

5. For instance, if a decision-maker testified in a deposition that he or she had flipped a coin to decide the claim, the court believes that it should be permitted to consider such evidence in determining whether the defendant's action was arbitrary and capricious.

vision would not be restored by surgery. Finally, Dr. Rothstein noted that, within one year of the accident, plaintiff had an "absence of depth perception so that he would not be able to judge distances." Dr. Rothstein also found that plaintiff had the potential for 20/70 vision after surgery.

█ Plaintiff argues that an "entire" loss of sight means the loss of all practical or useful vision, and not complete blindness. He argues that he lost all practical vision in his right eye, particularly because he lost binocularity, and that such loss cannot be restored by surgery. Plaintiff contends that Dr. Jordan's statement that he did not suffer an entire and irrecoverable loss of sight is not of consequence because those terms had not been defined for Dr. Jordan. Finally, plaintiff contends that defendant's decision was arbitrary and capricious because, as they testified in their depositions, the decision-makers did not know the meanings of all of the medical terms used by the doctors.

It is true that the overwhelming majority of courts [6] discussing the issue have held that a "loss of sight" insurance provision does not require total blindness, but rather that the sight remaining be of no practical use; generally, recovery has been permitted if the plaintiff could not distinguish or recognize objects, even if he or she could perceive light and darkness. J.H. Tiggs, Annotation, *Fracture or loss of member, or loss of sight, contemplated by accident policy or provision insuring against specific injury,* 87 A.L.R.2d 481 (1963); *see, e.g., Order of United Commercial Travelers of Am. v. Knorr,* 112 F.2d

679, 682 (10th Cir.1940) ("it has been held without exception that by the loss of an eye is meant the loss of the use of an eye for any practical purpose"); *Rice v. Military Sales & Service Co.,* 621 F.2d 83, 86 (4th Cir.1980); *Wallace v. Insurance Co. of N. Am.,* 415 F.2d 542, 543 (6th Cir.1969); *Pan–American Life Ins. Co. v. Terrell,* 29 F.2d 460, 461–62 (5th Cir.1928).

█ Plaintiff argues that defendant should have employed such interpretation in this case, and that any other interpretation constituted a "mistake of law" indicating arbitrary and capricious action. The court disagrees. Plaintiff has conceded that defendant had discretion to interpret the terms of its policy, and it was not bound to construe the "loss of sight" definition as a majority of courts has. This court is not charged with interpreting the provision, as were the courts in the non-ERISA cases cited above; rather, the court considers whether defendant's interpretation was reasonable. The court cannot say that defendant would have acted unreasonably in giving the word "entire" a literal meaning and requiring complete blindness, an interpretation embraced by a few courts. *See, e.g., State Farm Mutual Automobile Ins. Co. v. Sewell,* 223 Ga. 31, 153 S.E.2d 432, 433 (1967) (with respect to a provision covering "entire and irrecoverable loss of sight", district court erred in instructing that the provision covered the loss of sight for all practical purposes; term "entire" was unambiguous and meant the loss of all sight).[7]

---

**6.** The court applies federal common law in resolving disputes under ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (expectation of federal common law for ERISA); *Resolution Trust Corp. v. Financial Institutions Retirement Fund,* 71 F.3d 1553, 1556 (10th Cir.1995) (weight of authority supports application of federal common law to ERISA disputes). In developing that federal common law, federal courts may look to general principles of state law. *Frerking v. Blue Cross–Blue Shield of Kan.,* 760 F.Supp. 877, 880 (D.Kan.1991). Such state court interpretations of insurance policy provisions would not be preempted in this case. *See Winchester v. Prudential Life Ins. Co. of Am.,* 975 F.2d 1479 (10th Cir.1992). "[T]his does not mean that the federal courts attempt merely to decide what a majority of state courts have done in their interpreta-

tions of an insurance policy provision to establish the federal common law." *Arnold v. Life Ins. Co. of N. Am.,* 894 F.2d 1566, 1567 (11th Cir.1990).

**7.** Defendant contends in its reply brief that the provision at issue here is different from the "loss of sight" provisions considered by the other courts because here "the real issue is whether there has been the loss of a member." This argument borders on the frivolous. Defendant is at least bound by the express terms of the policy, which defines "loss" in this case as the "entire and irrecoverable loss of sight." Any attempt by defendant to disregard that express definition would have been arbitrary and capricious. In denying plaintiff's claim, however, defendant did not make the distinction that its attorneys have proposed in this litigation.

■ In this case, it is clear that plaintiff did have some visual acuity remaining in his right eye. Within one year of the accident (by which time the policy required the loss of sight to occur), plaintiff's visual acuity could be corrected to 20/100. Later, plaintiff had a best-corrected vision of only 20/200, but even then, surgery could likely improve that vision to 20/100 or better.[8] Thus, plaintiff's sight was "recoverable" to a level of 20/100, which would not constitute an "entire" loss of sight as that term is construed literally.

In addition, defendant's decision would still be reasonable here even under a practical-use standard. There is no evidence in he record that 20/100 vision, to which level plaintiff's vision was recoverable, does not permit practical and useful vision. plaintiff's vision may have worsened to a best-corrected level of 20/200, but that level was not noted until August of 1996, well outside the one-year limit imposed by the policy. Plaintiff did have a problem with depth perception within a year of the accident, but there is no evidence in the record that plaintiff had lost all practical use of sight in his right eye at that time. In fact, in his final denial of plaintiff's "loss of sight" claim, Mr. Schiller appeared to reach this very conclusion under a useful-vision standard: "Dr. Jordan documented no concerns regarding [plaintiff's] ability to perform other occupations that would not require 'good depth perception' or that the loss of visual acuity and depth perception was such that the vision in this right eye, in daily activities or the performance of other occupations, was of entirely no use." There was certainly no evidence before defendant that plaintiff could not, for example, distinguish or recognize objects—the standard commonly relied upon by courts to define the loss of practical use of sight.

Plaintiff relies heavily on the loss of binocularity, not correctable by surgery, that was noted by Dr. Brick. Plaintiff argues that, because his eyes cannot be used together and must therefore be used only one at a time, he has lost the practical use of sight in his right eye. See Rice, 621 F.2d at 85–87; Travelers' Protective Ass'n of Am. v. Ward, 99 Ind.App. 97, 187 N.E. 55, 57 (1933); Bilsky v. Mutual Benefit Health & Accident Ass'n, 182 Misc. 122, 49 N.Y.S.2d 848 (N.Y.Sup.Ct.1944). The court rejects this argument. First, it would not be unreasonable for defendant to have concluded, under the terms of its policy, that practical and useful sight remained in a single eye, even if the two eyes could not work together. See Harlan v. Aetna Life Ins. Co., 6 Wash.App. 837, 496 P.2d 532, 534 (1972) (finding sufficient evidence of useful vision, even though eyes could not be made to work together). In fact, Dr. Genovese–Stone appears to have reached that conclusion in stating that plaintiff had not suffered an entire and irrecoverable loss of sight even though surgery would not restore binocularity. Second, there is no evidence that plaintiff had completely lost binocularity or suffered a "significant [not entire] loss of usable vision" until Dr. Brick examined plaintiff in August of 1995. There is evidence that plaintiff suffered from poor depth perception and therefore would have had trouble judging distances. It is significant, however, that the ophthalmologists who saw plaintiff within one year of the accident, Drs. Jordan and Mehl-

The court must also comment on the following excerpt from defendant's brief: "The Tenth Circuit has previously determined the phrase 'entire and irrecoverable loss of sight' to be unambiguous." See Home Life Ins. Co. of New York v. Stewart, 114 F.2d 516, 518 (10th Cir.1940). That statement is completely inaccurate. Stewart involved a provision requiring "irrecoverable loss of sight in both eyes;" it found only that language unambiguous. Id. Moreover, the Tenth Circuit noted that the policy did not insure against the loss of an eye, but rather against the loss of sight, and it equated that latter phrase with the loss of function; such equation may in fact suggest an interpretation in line with the practical-use standard—which defendant was attempting to com-

bat in citing Stewart—especially given the Tenth Circuit opinion in Knorr that same year.

8. Plaintiff argues that his prospects after surgery should not be considered because he would not undergo such a procedure, given the fact that binocularity would not return. See, e.g., Rice, 621 F.2d at 87 (sight is irrecoverable if it is not capable of being recovered by proper treatment that an ordinarily prudent person would undergo in the same circumstances). There was no evidence before defendant, however, that the average person would not choose to have surgery. To the contrary, the discussions about possible surgery that pervade the doctors' reports appear to consider surgery a viable option for improving plaintiff's sight.

horn, did not note any problems with double vision or a loss of binocularity. Just as plaintiff's best-corrected vision worsened after one year, so could the conditions noted by Dr. Brick have developed after July of 1995. Thus, defendant did not act unreasonably in determining that plaintiff did not present sufficient evidence indicating that he suffered a loss of all useful vision within one year of the accident.

Finally, the court concludes that defendant quite reasonably relied on the statement by Dr. Jordan, plaintiff's treating physician, that plaintiff had not suffered an entire and irrecoverable loss of sight in the right eye. Plaintiff argues that the "legal meaning" of those terms had not been provided to Dr. Jordan. As explained above, however, defendant was not bound to a particular "legal meaning". Defendant could reasonably have believed that Dr. Jordan used those words as he understood them in his capacity as a licensed ophthalmologist. Defendant did not act arbitrarily or capriciously in adopting Dr. Jordan's interpretation of those words, whatever that interpretation may be.

Moreover, the fact that Mr. Gemmill or Mr. Schiller did not know the meanings of all of the medical terms used by the doctors does not alter the court's conclusion. The doctors explained the effects of the injuries to plaintiff's eye in plain terms, and defendant reasonably relied on those explanations in determining whether plaintiff experienced a sufficient loss of sight within a year of the accident. In fact, in seeking an independent medical opinion, defendant specifically asked about the effects to plaintiff's visual functioning. The decision-makers' inability to define the particular medical terms describing the injuries to the eye does not make their decisions about the effects of the injuries arbitrary and capricious.

In summary, the court concludes that defendant acted reasonably in denying plaintiff's "loss of sight" claim. It considered the opinions of numerous experts, including those of plaintiff's own treating physician, and even obtained an independent medical report. Defendant's denial of the claim was not arbitrary and capricious, even under a lesser degree of deference.

### V. Disability Claim

 Plaintiff also seeks review of defendant's denial of benefits under the "permanent total disability" provision. The court concludes that, even granting defendant only a small amount of deference, defendant's decision to deny benefits was not arbitrary and capricious, and defendant is therefore entitled to summary judgment on this claim.

Under the terms of the policy, the claim turns on whether plaintiff was able, because of the injury to his eye, to perform "the duties of any occupation for which he is suited by education, training or experience." [9] Plaintiff contends that he meets that standard because his education, training, and experience have made him suited only for the occupation of machinist, the duties of which he can no longer perform. Plaintiff also relies on the facts that the TSA did not yield any positions for him with primarily or secondarily transferable skills and that training would be required for all suggested positions.[10]

Plaintiff concedes that it is not enough under the policy to be unable to perform his regular machinist job. Such condition would constitute a "total disability," but a more stringent standard governs "permanent total disability," that is, the inability to perform any job for which he is suited by education, training, or experience. Plaintiff's position

**9.** Defendant also argues that plaintiff's disability was not continuous and permanent because his visual acuity could be corrected. The court rejects this argument. The disability that was continuous and permanent was the loss of a certain amount of vision, particularly near vision and depth perception. Moreover, plaintiff's position hinges on his lack of sight sufficient to enable him to be a machinist, and defendant has not disputed the fact that such disability, so defined, would be permanent.

**10.** Plaintiff also argues that the record does not contain any actual TSA analysis. That fact does not render defendant's decision arbitrary and capricious. The record reveals that TSAs were performed, and it includes the results and explanations therefor, which were likely more useful to defendant than the full TSAs.

that he is only suited to be a machinist would conflate the two standards in this case. Defendant did not act unreasonably, however, in refusing to adopt so confining an approach in applying the "permanent total disability" standard.

Plaintiff stresses that the provision does not require an inability to perform *any* occupation and urges that the modifying language be given some effect. The court agrees that plaintiff need not be shown helpless and that some limits do apply. *See Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 431 (7th Cir.1992) (insured need not be utterly helpless); *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir.1988) (occupation and earnings must at least approach the dignity of a livelihood). Defendant, however, did limit its inquiry in attempting to determine whether there remained occupations for which plaintiff was suited. The TSA that defendant ultimately relied upon used plaintiff's education and former work experience to find occupations that—as the name of the analysis suggests—involved skills that plaintiff could transfer from his previous jobs. Thus, defendant attempted to given meaning to the limitation in the definition of "permanent total disability." In so doing, defendant suggested 25 possible alternate occupations for plaintiff.[11]

The court concludes that defendant's approach was not arbitrary and capricious. Certainly, defendant could have accepted plaintiff's argument that he was only suited to be a machinist. *See Herring v. Golden State Mutual Life Ins. Co.*, 114 Mich.App. 148, 318 N.W.2d 641, 643 (1982) (plaintiff was disabled where all of his education, training, and experience went to a particular occupation, which he could no longer perform). Instead, however, defendant reasonably determined, by having a TSA performed, that plaintiff's job as a machinist did involve numerous skills on a variety of levels, that such skills would transfer to other occupations within plaintiff's educational and physical

limits, and that plaintiff was not therefore unable to perform any job for which he was suited by education, training, or experience. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302 (5th Cir.1994) (defendant's conclusion that a 65–year–old man with a high school diploma and experience in the "work-a-day world" could find a job that allowed for his physical limitations was not arbitrary and capricious).

The limiting language did not require an exact fit with the prior job here; otherwise, as noted above, the separate definition of "permanent total disability" would be superfluous, given the standard for "total disability." Rather, that language was more likely intended to make sure that the insured had the minimum education or experience to perform the job; for instance, defendant could not avoid payment by insisting that plaintiff's eye problems would not disqualify him from being the Chief Justice of the Supreme Court. The fact that defendant did attempt to link alternative occupations to plaintiff's education and experience makes its determination reasonable.

It is also worth noting that plaintiff has not shown that, in fact, he is not suited by education, training, or experience for the occupations suggested by defendant. *See O'Brien v. Metropolitan Life Ins. Co.*, 968 F.2d 20, 21 (10th Cir.1992) (in upholding determination that plaintiff was not disabled, court noted that plaintiff failed to establish that she was not suited by education, training, or experience for the occupations suggested by defendants). Mr. Dreiling, plaintiff's vocational expert, stated that the suggested jobs were not "appropriate" for plaintiff. Mr. Dreiling did not indicate, however, that he did a separate analysis comparable to the TSA; instead, he merely concluded that plaintiff had no transferable skills consistent with his education or work experience. Defendant's vocational expert, Mr. Hardy, disagreed, citing the new TSA he performed. Because Mr. Hardy's opinion was not unsupported, defen-

---

**11.** *Cf. Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 830 (6th Cir.1996) (defendant could not merely state that someone with the insured's education should be able to find a job); *Bonner v. FMC Long–Term Disability Plan*, 21 F.3d 1111, 1112 (9th Cir.1994) (reversing defendant's denial of disability benefits where defendant provided no suggestions regarding work available to plaintiff, but instead maintained that there must be "some jobs" that plaintiff could perform).

dant acted reasonably in relying on it. Defendant also quite reasonably noted that plaintiff has performed the duties of a job requiring at least some technical skill since the accident.

Finally, plaintiff stresses that the occupations suggested by defendant required training. The fact that plaintiff would have to learn procedures or information specific to a particular job does not make him ill-suited by education, training, and experience. Certainly, plaintiff underwent training as a machinist in using new or different machines or materials. Only the same occupation would not demand some training, and defendant did not act unreasonably in reading the "permanent total disability" provision more broadly than that.[12]

Defendant's denial of plaintiff's disability claim was not arbitrary or unsubstantiated. Defendant undertook an analysis of possible occupations considering plaintiff's education and work experience, as well as his physical limitations. When plaintiff's attorney raised concerns about the TSA, defendant conducted an independent review of the claim. Defendant addressed the concerns and even made concessions, and conducted another TSA. Defendant invited plaintiff to do his own analysis, and it considered the report subsequently submitted. Defendant did not merely dismiss plaintiff's argument and conclude that plaintiff could obviously hold a job; rather, defendant conducted a thorough, reasoned analysis of the claim based on the policy terms. Even accounting for defendant's conflict of interest, the court cannot say that defendant's denial of plaintiff's disability claim was arbitrary and capricious. Accordingly, summary judgment is appropriate.[13]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion in limine (Doc. 31) is granted in part and denied in part, as set forth more fully herein.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's motion for summary judgment (Doc. 30) is granted, and plaintiff's claims are hereby dismissed.

**IT IS SO ORDERED.**

---

12. With respect to training, plaintiff's position appears somewhat inconsistent. Mr. Dreiling, his expert, indicated that plaintiff's occupation as a master control operator did not meet the requirements because it was an unskilled job, requiring only two weeks of "on-the-job orientation".

13. In light of the court's rulings, the issue of plaintiff's right to recover prejudgment interest is moot. The court will address the issue of attorney fees upon proper motion, as contemplated by defendant in its brief.