

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-28-2000

# Orvosh v. Program Grp. Ins. for Volkswagon of America, Inc.

Precedential or Non-Precedential:

Docket 99-3589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Orvosh v. Program Grp. Ins. for Volkswagon of America, Inc." (2000). *2000 Decisions.* Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-3573/3589

DONALD ORVOSH,

     Appellant in 99-3589

v.

THE PROGRAM OF GROUP INSURANCE FOR SALARIED
EMPLOYEES OF VOLKSWAGEN OF AMERICA, INC.;
THE VOLKSWAGEN OF AMERICA, INC. EMPLOYEE
BENEFIT PLAN COMMITTEE, individually and as Plan
Administrator of the Program of Group Insurance for
Salaried Employees of Volkswagen of America, Inc.;
VOLKSWAGEN OF AMERICA, INC.,

     Appellants in 99-3573

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Civil No.: 98-cv-0166
District Court Judge: Honorable Robert J. Cindrich

Argued: May 11, 2000

Before: GREENBERG, McKEE, Circuit Judges and
SHADUR,* District Judge

(Filed: July 28, 2000)

_____

* Hon. Milton I. Shadur, Senior Judge of the United States District Court
for the Northern District of Illinois, sitting by designation.

Paul Amato, Esq. (Argued)
Richard J. Antonelli, Esq.
BUCHANAN INGERSOLL
PROFESSIONAL CORPORATION
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

 Attorneys for Appellants/
Cross Apellees

Abby S. DeBlassio, Esq. (Argued)
FISHER, LONG & RIGGONE
101 West Pittsburgh Street
Greensburg, PA 15601

 Attorneys for Appellee/
Cross Appellant

OPINION OF THE COURT

McKEE, Circuit Judge.

The defendants appeal the district court's grant of summary judgment in favor of plaintiff, Donald Orvosh, and against defendants on Orvosh's claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. SS 1001 et seq. Orvosh has also cross-appealed from the district court's denial of attorney fees. For the reasons that follow, we will reverse the district court's grant of summary judgment in favor of Orvosh. Moreover, we will affirm the order of the district court denying attorney's fees as we see no reason to reverse that denial.

I.

David Orvosh entered the job market with a high school diploma and some college credit. He worked from 1962 to 1967 as a lab technician in Paint Research for PPG Industries. From 1967 to 1973 he worked first as a research technician in Paint Production, then as supervisor of a paint line for Season-All Industries. Orvosh also worked as a material foreman at Chrysler Corporation from 1973 until 1977.

2

On January 7, 1977, Orvosh was hired by Volkswagen of America, Inc. and he stayed with the company until March, 1987. During his time with Volkswagen, Orvosh worked in both the Paint Process Department and Paint Production Departments holding a variety of positions including senior chemist, senior lab engineer and general supervisor.

In March of 1987, Orvosh's treating physician, Dr. Angelo DeMezza, diagnosed him with asbestosis,[1] atelectasis,[2] deep vein thrombophlebitis ("DVT"),[3] hyperthyrodism, and right pleural effusion.[4] A year later, Orvosh suffered a heart attack and was diagnosed with coronary artery disease. He underwent a cardiac catherization in 1989, and in 1991 a piece of his lung was removed due to a left pleural tumor. In 1994, Orvosh had a second cardiac catherization, which disclosed that his right coronary artery had a 100% blockage, and his left coronary artery had a 30% blockage. In addition, Orvosh suffers from Graves' disease which

---

1. Asbestosis is defined as a "lung disease caused by inhalation of asbestos fibers, characterized by interstitialfibrosis, and associated with
mesothelioma and bronchogenic carcinoma." This and all other definitions of Orvosh's medical conditions were taken from the district court's opinion. The district court adopted definitions from a medical encyclopedia that Volkswagen included in its motion for summary judgment. Orvosh did not challenge the definitions, and indeed relies on the same definitions in his briefs to us. Therefore, we will rely on the definitions as well.

2. Atelectasis is defined as "a collapsed or airless state of the lung, which
may be acute or chronic, and may involve all or part of the lung."

3. DVT is defined as the formulation of a thrombus, which impedes the flow of blood in the arteries or veins. Venous thrombosis occurs most often in the legs or pelvis. The symptoms of venous thrombosis -- a feeling of heaviness, pain, warmth, or swelling in the affected part, and possibly chills and fever -- do not necessarily indicate its severity. Immediate medical attention is necessary in any case. Treatment requires bed rest with the legs elevated and application of heat to the affected areas, and the affected part must be immobilized to prevent the clot from spreading, and anticoagulant drugs may be given. Immobility is a prime factor in the development of thrombosis; an exercise routine is necessary in treatment and prevention.

4. Pleural effusion is defined as "an accumulation of fluid in the space between the membrane encasing the lung and that lining the thoracic cavity," threatening the collapse of the lung.

impairs his vision. Over time, his condition worsened and he also developed a pulmonary embolism.[5]

Volkswagen paid Orvosh short-term and long-term disability ("LTD") benefits in accordance with its Salaried Group Insurance Plan which had been adopted in October, 1977. In June, 1995, Volkswagen adopted the "Program of Group Insurance for Salaried Employees of Volkswagen of America, Inc." ("the Plan"). Both parties agree that the 1995 plan governs this case and that it is covered by ERISA.

The Plan defines "disabled" as follows:

> For the first 12 months that you are receiving long term benefits, `disabled' means you cannot engage in your specific position at the Company. For the remainder of your disability you must be unable to work for any employer in a paying job for which you are reasonably fitted by education, training, or experience. However, you can take part in rehabilitative employment and still be considered disabled.

App. at R68.

Benefits are payable under the Plan for a covered disability if the following conditions are satisfied:

> 1. You are "disabled" (as defined by the Plan)
>
> 2. You are under a doctor's care
>
> 3. You provide required proof of your disability
>
> 4. You submit to an examination by an impartial doctor, at the company's expense, if requested. The results of this examination will determine whether or not you receive or continue to receive disability benefits.

Id.

The Plan further provides that:

> Long-Term Disability benefits start on the day after

_____

5. Pulmonary embolisms occur when an embolus or blood clot detaches itself from a vein in the leg or pelvis and blocks the pulmonary artery or one of its branches.

4

> Short-Term Disability benefits stop. These benefits can
> continue through the end of the month in which you
> attain age 65, provided your Long-Term disability
> benefits began before age 60, and you are certified by
> your physician as being totally disabled.

Id. at R69.

Volkswagen concluded that Orvosh met all prerequisites for LTD benefits, and it paid those benefits for ten years without dispute. During that time, Dr. DeMezza repeatedly certified that Orvosh was totally disabled, and he identified several of Orvosh's disabling conditions including: DVT, chest pain, and asbestosis.

In 1995, Volkswagen changed the administrator of its LTD benefits from Metropolitan Life Insurance Company to UNUM Life Insurance Company of America. UNUM reviewed Orvosh's claim shortly after the change. In August of 1995, UNUM received copies of Orvosh's medical records and asked Dr. DeMezza to complete a questionnaire regarding Orvosh's condition. Pursuant to that inquiry, Dr. DeMezza told UNUM that Orvosh's diagnosis included arteriosclerosis, heart disease, recurrent pulled groin, and DVT. Dr. De Mezza further indicated that Orvosh was being treated with medication and that the prognosis for his return to gainful employment was "bleak" because of dyspnea.[6]

UNUM then had its own physician, Dr. Charles Perakis, review Orvosh's medical history. Dr. Perakis concluded that Orvosh's pulmonary function appeared to be adequate for sedentary work but that reevaluation of his coronary artery disease was necessary to assess his true functioning status.

On January 10, 1996, UNUM forwarded a follow-up questionnaire to Dr. DeMezza. Dr. DeMezza responded that the only symptom causing impairment was "difficulty

_____

6. Dyspnea is a condition of difficult or painful breathing due to inadequate ventilation or insufficient amounts of oxygen circulating in the blood. People suffering from this condition cannot get enough oxygen in the blood, and oxygen therapy is required.

5

breathing with exertion," but that in his opinion, Orvosh was unable to work in any type of gainful employment.

UNUM interviewed Orvosh in early 1996. During that interview, Orvosh reported that he did housework including cleaning dishes and making dinner. He also reported an ability to perform various house cleaning tasks. Orvosh also reported that he engaged in various recreational activities including hunting and walking his dog. Finally, Orvosh reported that he drove his wife home from work every day, but that his wife drove herself to work because Orvosh experienced double vision upon waking in the morning.

Also in January, 1996, Jackie Roberts, an UNUM Disability Benefits Specialist, submitted a Regional Consulting Physician Referral Sheet to Mary Hearn, an UNUM Registered Nurse, asking Hearn to assess Orvosh's claim. After reviewing Orvosh's entire file, Hearn concluded that although the medical information was insufficient to determine the severity of his cardiac status, Orvosh appeared to have the capacity for sedentary to light work.

Sometime after Hearn reviewed Orvosh's file, Roberts requested that Triebold & Associates perform a Transferable Skills Assessment ("TSA") to determine whether Orvosh had the functional capacity to perform sedentary work. However, UNUM did not give Triebold a complete picture of Orvosh's health. Rather, UNUM told Triebold only that Orvosh suffered from asbestosis. Triebold reviewed Orvosh's work history, educational background, and personal data to prepare the TSA. Triebold assumed "for the purposes of this assessment . . . a functional capacity for work at the sedentary level of physical exertion." App. at R200. Triebold concluded that Orvosh's past highly skilled work "would not provide him with transferable skills for work at the sedentary level of physical exertion given his over 9 years absence from the work force at age 57." App. at R200-1. However, Triebold suggested that "retirement type positions" such as gate attendant, surveillance system monitor, and information clerk would be appropriate for Orvosh, given his health. According to the TSA, such retirement type positions,

> would utilize Mr. Orvosh's basic work skills that he
> gained from performing his past work [including] his

6

ability to perform simple to complex tasks within a schedule and without special supervision, interact appropriately with co-workers and supervisors, adhere to company procedures and safety policies, etc.

App. at R201.

Based on the TSA and other information gathered during the investigation, UNUM recommended that Volkswagen terminate Orvosh's LTD benefits. However, Volkswagen did not immediately act on that recommendation. Instead Volkswagen instructed UNUM to obtain an independent medical exam ("IME") to confirm that termination of those benefits was appropriate. Pursuant to that request, UNUM sought recommendations for appropriate testing through a Regional Consulting Physician Referral Form.

On September 23, 1996, UNUM sent Dr. DeMezza a copy of the TSA and asked him whether he agreed with its conclusion that Orvosh was capable of performing in "retirement type positions." Dr. DeMezza disagreed with the TSA and advised UNUM that sedentary work of any kind was contraindicated because of recurrent episodes of DVT and pulmonary embolism. Dr. DeMezza also stated that Orvosh could not have periods of prolonged sitting without movement.

In November, 1996, UNUM contacted Dr. Seymoure Krause, a cardiac specialist, and asked him to conduct an IME. Krause reviewed Orvosh's medical history, evaluated his physical capabilities, and tested his functional capacity by means of a thallium stress test which measures heart rate at the peak of stress. Krause issued a report in which he noted that Orvosh's chest discomfort and dyspnea were more likely related to pulmonary disease and thoracotomy than coronary heart disease. Krause recommended that Orvosh "have pulmonary function tests and also obtain an opinion from a pulmonary specialist." App. at R253. As part of his report, Dr. Krause also filled out a physical capabilities evaluation form. Krause answered an inquiry into Orvosh's ability to work that was contained on that form by stating: "it depends on the job assignment." App. at R254.1. Dr. Krause opined that in an eight hour work day, with rest, Orvosh could sit for up to six hours, stand for up to six hours, and walk for up to one hour.

7

Several of UNUM's doctors and nurses reviewed the results of the IME and concluded that Orvosh could work at a sedentary job. Similarly, after reviewing the IME, Triebold concluded that Orvosh could perform any of the "retirement type positions" previously referred to as well as "numerous additional occupations." App. at R307-8. Dr. DeMezza received a copy of both the IME report and Triebold's most recent report for review. However, he remained unpersuaded and maintained his opinion that Orvosh was totally disabled.

Nevertheless, despite Dr. DeMezza's opinion to the contrary, UNUM concluded that Orvosh was not "totally disabled" under the Plan, and advised Orvosh that his LTD benefits would be terminated. Orvosh filed an unsuccessful administrative appeal of that decision, and then sued Volkswagen in state court seeking reinstatement of his LTD benefits. Volkswagen removed the case to the United States District Court for the Western District of Pennsylvania because it arose under federal law.

On cross-motions for summary judgment, the district court held that Volkswagen's decision to terminate Orvosh's benefits was arbitrary and capricious and ordered Volkswagen to reinstate Orvosh's benefits retroactive to the date of termination. The court also considered, but denied, a motion for attorney's fees Orvosh filed as a prevailing party pursuant to 11 U.S.C. S 1132 (g)(1). Volkswagen's appeal of the district court's grant of summary judgment and Orvosh's cross-appeal of the court's denial of attorney's fees are now before us.

II.

When we review a grant of summary judgment we must apply the same test as the district court. See Carter v. Rafferty, 826 F.2d 1299, 1304 (3d Cir. 1987). Namely, summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We exercise "plenary review over

8

the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." Louis W. Epstein Family Partnership v. Kmart Corp. , 13 F.3d 762, 766 (3d Cir. 1994).

In reviewing a denial of benefits under an ERISA plan, we must first determine the extent to which the plan administrator has discretion to interpret the Plan. If the Plan grants the administrator the authority to determine eligibility, we review a denial of benefits under an "arbitrary and capricious" standard. Under that standard, a plan administrator's decision will be overturned only if it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Abnathya v. Hoffman– La Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993). " `[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.' " Id. at 45 (quoting Lucash v. Strick Corp., 602 F.Supp. 430, 434 (E.D. Pa. 1984). Here, the Plan vests the administrator with the authority to "interpret the plan and make final decisions on such things as eligibility and payment of benefits," App. at R90, and we must therefore undertake a deferential review. Moreover, the parties have stipulated that the arbitrary and capricious standard governs our inquiry. See Stip. P 2 at App. at R58.7

III.

Thus, our inquiry turns on whether defendants were arbitrary and capricious in their interpretation of the Plan's LTD requirement. Under that requirement Orvosh was not eligible for LTD benefits unless he was unable to perform in

_____

7. After this case was argued, we decided that a heightened standard of review applies where the same entity both funds and administers an ERISA plan. See Pinto v. Reliance Standard life Ins. Co., ___ F.3d ___, 2000 WL 696383 (3d Cir. May 31, 2000). Here, UNUM provides important administrative functions, but the Plan itself states that the official Plan administrator is "Volkswagen of America Inc." App. at R90. However, valid stipulations entered into freely and fairly should not be lightly set aside. See Waldorf v. Shuta, 142 F.3d 601, 616 (3d Cir. 1998). Thus, we will apply the arbitrary and capricious standard of review.

9

a position for which he was "reasonably fitted by education, training, or experience." As noted above, while at Volkswagen, Orvosh worked as a senior chemist and a senior lab engineer in the Paint Process Department, and as a general supervisor in the Paint Production Department. Even though several ailments prevented Orvosh from performing any of those jobs, the Plan Administrator concluded that he was no longer totally disabled because subsequent medical evaluations found him capable of working as a gate attendant, surveillance system monitor, information clerk; or performing similar "retirement type" jobs. Given the totality of circumstances here, we can not conclude that Volkswagen was arbitrary and capricious in concluding either that Orvosh was capable of performing the duties required by such positions, or that the positions provided a reasonable fit with Orvosh's training, education, and experience.

Volkswagen argues that its assessment of Orvosh's ability to work was substantially supported by the evidence. Several physicians and health care workers reviewed Orvosh's medical history. They provided Orvosh's treating physician with copies of the assessments and solicited his opinion as to whether Orvosh was capable of working. Although Dr. DeMezza constantly and continually expressed his disagreement with Volkswagen's determination that Orvosh could perform sedentary "retirement type" employment, that doesn't negate the fact that Volkswagen solicited Dr. DeMezza's opinion as part of its inquiry into Orvosh's capacity to work.8 Volkswagen therefore argues that its decision not to continue paying benefits cannot be arbitrary and capricious because of the quantity and quality of its inquiry.

Orvosh essentially argues that the investigation is irrelevant. He asserts that, under the plain language of the Plan, once long term disability benefits are established,

_____

8. We do not intend to suggest that an employer or plan administrator can insulate its decision to deny benefits merely by asking an employee's treating physician for his/her opinion. A pro forma request for such an opinion will not camouflage a denial of benefits that is otherwise arbitrary and capricious.

10

they cannot be terminated unless an impartial doctor examines the patient/employee and determines that the individual is capable of working at a job for which he or she is reasonably suited. It is true that neither the TSA nor the assessments by UNUM physicians were conducted by an impartial physician. However, Orvosh was also examined by Dr. Seymoure Krause, and his impartiality is not challenged.

As noted above, Krause concluded that Orvosh could: sit or stand for six hours during an eight hour workday with rest, walk for one hour with rest, lift up to twenty pounds for up to 1/3 of the day; and bend, stoop, squat, kneel, climb stairs, crawl, reach above his shoulders, and walk on uneven surfaces for up to 1/3 of the day. Dr. Krause also reported that Orvosh's manual dexterity appeared good and that there were no other potential environmental restrictions which Orvosh's medical condition would require. When asked whether Orvosh could work, Krause responded, "it depends on the job assignment." App. at R254.1. Although it can be argued that Dr. Krause's response was so equivocal as to be of little use, it can not be successfully argued that Krause's evaluation confirmed that Orvosh was incapable of working at all, or that it was arbitrary and capricious for Volkswagen to rely on Krause's report.

Dr. Krause did qualify his conclusions by stating that Orvosh's chest discomfort and dyspnea were more likely related to pulmonary disease and his thoracotomy rather than his coronary heart disease, and Krause recommended that Orvosh "have pulmonary function tests and also obtain an opinion from a pulmonary specialist." App. at R253. We realize that, despite Dr. Krause' recommendation, Volkswagen did not consult a pulmonary specialist.

Volkswagen decided against ordering a second IME directed at Orvosh's pulmonary condition. Instead, it relied upon Orvosh's lifestyle, medical history, and the initial IME to conclude in essence that no matter what his precise pulmonary condition, it was not consistent with a finding of total disability. For example, on May 23, 1997, Dr. Feagin, a UNUM physician, reviewed Orvosh's file, specifically addressing his pulmonary and vascular conditions. Dr.

11

Feagin concluded that test results showed Orvosh to have "no significant pulmonary DVT or peripheral vascular disease impairment for at least medium work." App. at R322. Dr. Feagin's conclusions were also supported by Anne Giradot, a UNUM registered nurse, and Orvosh's chest X-rays which revealed only a modest degree of pulmonary emphysema.

Thus, Volkswagen's decision to terminate Orvosh's long term benefits was clearly consistent with the weight of the medical information available to it, and we can not conclude that Volkswagen's decision, or UNUM's recommendation, was arbitrary or capricious. Volkswagen considered Orvosh's overall medical condition and his well documented medical history before deciding that he was capable of performing the duties of a sedentary, retirement job such as a gate attendant, surveillance system monitor or information clerk. Moreover, it is important to note that Volkswagen continued to pay Orvosh while it investigated his medical condition. There was no rush to cut off the payments that Volkswagen had been making for over 10 years. Accordingly, we can not agree that the decision to terminate Orvosh's benefits was arbitrary and capricious.

The more difficult question before us is whether these "retirement-type positions" are reasonably suited to Orvosh's education, training, and experience. In arguing that they are, Volkswagen relies in part upon Buchanan v. Reliance Standard Life Ins. Co., 5 F.Supp.2d 1172 (D.Kan. 1998) and Brooks v. Protective Life Ins. Co., 883 F.Supp. 632 (M.D.Ala. 1995), aff 'd 77 F.3d 498 (11th Cir. 1996).

The plaintiff in Buchanan was a machinist who lost an eye while working on a fireworks display. Under his employer's disability plan, "Permanent Total Disability" meant that the participant was "not able to perform the duties of any occupation for which he is suited by education, training or experience." Buchanan , 5 F.Supp.2d at 1174. The defendant insurance company performed a TSA and concluded that the plaintiff was not disabled under the plan because he could perform other jobs within the company even though he could no longer work as a machinist. Id. at 1176. Upon review, the court concluded that the decision to deny total disability coverage was not

12

arbitrary and capricious even though plaintiff would need additional training to perform some of the suggested jobs. Id. at 1184-5. The court found that the language of the plan did not require an "exact fit" with the employee's background, but was merely intended to ensure that the employee had the "minimum education or experience to perform the job. For example, the defendant could not avoid payment by insisting that plaintiff 's eye problems would not disqualify him from being the Chief Justice of the Supreme Court." Id. at 1185.

The plan at issue in Brooks defined an individual as disabled if he/she was "unable to engage in any business or occupation or to perform any work for compensation, gain or profit for which he[/she] is reasonably fitted by education, training, or experience." Brooks , 883 F.Supp. at 634, n.1. The court upheld the administrator's decision to terminate benefits because Brooks, a power company lineman prior to his injury, could reasonably work as a meter reader. The court concluded that the administrator was under no "legal duty to concern itself with the occupational position for which Brooks was best-suited." Id. at 640. See also Duhon v. Texaco, Inc., 15 F.3d 1302, 1307 (5th Cir. 1994) (holding plaintiff not totally disabled because although no longer able to perform his former occupation as a truck driver, he remained both capable and "qualified by training, education, or experience" to complete sedentary to light work).

The defendants urge us to adopt the analysis of Brooks, Buchanan and Duhon. They argue that we should conclude that the language of the Plan is intended to ensure only that an employee has the minimum qualifications for the suggested jobs.

Given the deference that must be afforded here, we need not agree with the administrator's interpretation of a "reasonable fit." We need only determine that its interpretation is not contrary to the Plan language and that it is rationally related to a legitimate Plan purpose. Volkswagen's interpretation easily survives both inquiries. It appears that, although Orvosh is no longer able to fulfill the duties of his former job, he is capable of securing other gainful employment for which he is reasonably suited. The

administrator's conclusion is thus not contrary to the plain language of the Plan and it clearly is rationally related to the legitimate purpose of preserving the Plan's resources for legitimately disabled claimants.

Accordingly, we conclude that the district court erred in granting summary judgment in favor of Orvosh, and its judgment will therefore be reversed. Further, we hold that Volkswagen did not act arbitrarily or capriciously in discontinuing total disability benefits, and we will therefore order that summary judgment be entered in favor of the defendants.

IV.

Orvosh cross-appeals the district court's decision to deny him attorney fees pursuant to 29 U.S.C. S 1132(g). Obviously, we need not dwell on this point given our reversal of the district court's grant of summary judgment. See Noorily v. Thomas and Betts Corp., 188 F.3d 153, 162 (3d Cir. 1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1555 (2000).

V.

For the foregoing reasons, we will reverse the district court's grant of summary judgment in favor of Orvosh, and remand with instructions to enter summary judgment in favor of the defendants. Consequently, we will affirm the district court's denial of attorney's fees.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit